### JACOB SHARP *vs.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK.

If a party makes representations, in such manner as to import a knowledge in him of facts, when in truth he has no knowledge of the facts, and the representations are made with the intent that another shall rely on them, and the latter does rely on them, and the representations turn out to be false, it is as much a fraud as if the party making them knew them to be untrue.

Where the complaint, in an action to recover damages for false representations, sets forth the representations that were made, stating them as representations of fact made by the defendants of their own knowledge, and not as expressions of opinion or belief; that those representations were

Sharp *v.* Mayor &c. of New York.

false; that the plaintiff relied on them, and that he suffered damage thereby, this is sufficient to entitle the plaintiff to recover, upon proof of those facts, unless the defendants can justify their representations; although the complaint does not in terms allege any fraudulent, willful or intentional misrepresentation.

Upon those facts the law adjudges fraud.

Where parol proof of representations made at the time of executing a lease is offered, not for the purpose of showing that the lease was intended to pass something which by its terms was not passed, but to show what the terms of the lease would have passed, if the representations had been true, it is not liable to the objection that a written instrument cannot be contradicted &c. by parol evidence.

So held where a lease of a ferry slip demised to the lessee the slip "or so much thereof as belongs to the parties of the first part," and the representations sought to be proved were that the lessors owned the whole slip, with a trifling exception.

A committee of a common council, to whom is referred the petition of an applicant for a lease of a slip and ferry privileges, has power to bind the corporation by its representations in respect to the title of the corporation to the slip; where the representations are such as touch the very matter with which the committee is charged. CLERKE, J. dissented.

The general principle that a corporation may delegate to agents the performance of any act which it can itself perform, is well established. *Per* BARNARD, J.

There is no principle of the common law by which the incidents attaching to the appointment of an agent, when that appointment is made by a corporation, are more restricted than when the appointment is made by an individual. *Per* BARNARD, J.

A principal is liable for the false representations of his agent, made in and about the matter for which he was appointed agent, not on the ground of express authority given to the agent to make the statement, but on the ground that as to the particular matter for which the agent is appointed he stands in the place of the principal, and whatever he does or says in and about that matter is the act and declaration of the principal, for which the principal is just as liable as if he had personally done the act, or made the declaration.

The power of the agent to render the principal liable for representations flows from his mere appointment to do the act or transact the business in and about which the representations are made.

Where a corporation has power to do some act, and as incident to that act to render itself liable for representations made in and about the doing of that act, it can appoint an agent to do the act; and from the mere fact of such appointment the same powers will flow to the agent as if he had been appointed by an individual; provided only that the powers so flowing could have been exercised by the corporation itself.

Sharp *v.* Mayor &c. of New York.

Thus, where a municipal corporation had power to negotiate a lease of a slip, and in the course of such negotiation to render itself liable for any misrepresentation made in relation thereto; *Held* that it had also power to appoint an agent to conduct the negotiation, and from such appointment there flowed to the agent the power to render the corporation liable for any misrepresentation. CLERKE, J. dissented.

After the granting of a lease of a slip, by the corporation of New York, to S. the lessee informed the officers of the corporation that his possession of the property, which had been represented to him to belong to the city, had been obstructed. The common council then passed a resolution directing the property to be surveyed. It was surveyed, and the surveyor made a map representing the property to belong precisely in accordance with the representations made to S. Thereupon another resolution was passed, directing the corporation counsel to put and keep the lessee in the possession and enjoyment of the property as laid down on the map. *Held* that the reasonable presumption and fair intendment was that the common council, when it passed these resolutions, knew of the representations that had been made, and passed the resolutions in view of them; and that this was a ratification of the act of the committee in making such representations; and the common council, in effect, again represented that the corporation owned the property.

A PPEAL from a judgment entered at a special term. The action was brought by Jacob Sharp, to recover damages for injuries sustained by him in consequence of certain misrepresentations made by the defendants. The cause was tried before Mr. Justice HOGEBOOM and a jury, at the New York circuit, in October, 1861. It appeared, from the evidence produced at the trial, that in the month of March, 1852, the plaintiff applied, by petition to the common council of the city of New York, for a lease of the slip at the foot of Wall street, with the right of establishing and taking the tolls of a ferry between that point and Brooklyn. The misrepresentations complained of were made in respect to the title of the corporation to the inside of the slip, on the east. It appeared from the maps of the corporation, lodged in the office of the street commissioner, that the defendants owned the whole of the slip of which he sought a lease, except a small triangle hereafter mentioned. The boards of aldermen and assistants referred the petition of the plaintiff to their

respective ferry committees. The plaintiff appeared at different times before these committees, and upon every inquiry of his, in respect to the extent of the corporation's right to the slip in treaty, he was informed that it owned and proposed to lease to him the whole of the slip from pier to pier, with the exception, only, of a small triangular portion at the upper end. In conformity with a resolution of the common council, dated June 16, 1852, an indenture of lease was executed on the 1st of July, 1852, by which the defendants demised to the plaintiff "the slip at the foot of Wall street, in the city of New York, or so much thereof as belongs to the parties of the first part," &c., and also the franchises and emoluments of the ferry to be established between this slip and some convenient point in Brooklyn; and exacted from him a covenant that he would, at his own proper cost, charge and expense, furnish, provide and navigate, upon the said ferry    *    *    *    *    good and substantial steam ferry boats, and keep the said steam ferry boats, at all reasonable times, continually employed on the said ferry during the term granted. When this lease was offered to the plaintiff, he asked why the description was so indefinite, and inquired what the defendants meant by the words "so much thereof as belong," &c. But the comptroller and corporation counsel explained to him, by reference to a map, that the exception was intended to apply only to the "triangle" at the upper part of the slip. Upon this representation the plaintiff accepted the lease. He immediately commenced to build, on the Brooklyn side, a pier and bulkhead for the uses of his ferry, had nearly finished them, and had built three boats, but had done little on the New York side, when he first heard of the Murray claim to a large part of the Wall street slip. Sharp reported what he had heard to the comptroller, he to the common council, and they, on the 9th of September, 1852, adopted a resolution directing a survey of the slip for the location of the ferry. The survey was accordingly made, and the map represented the right of Murray to be

limited to this triangular piece, an inconsiderable part of the slip. On the 21st of September, 1852, an injunction was served upon the plaintiff, at the suit of Robert J. Murray, restraining him from interfering in any way with the claim set up by Murray to free and convenient access to, and use of, one tier of births along the west side of pier No. 16. The plaintiff reported this interference with his supposed rights under the corporation's lease, and the council passed, on the 14th of October, 1852, a resolution instructing the corporation counsel to secure the plaintiff's possession and enjoyment of the slip, as laid down on the map drawn upon the survey of the street commissioner. The corporation became parties defendant to the suit of Murray against Sharp. By a decision of the court of appeals in this case, affirming the decision of the superior court, the claim of Murray was established. Meantime, on the 1st of November, 1852, the plaintiff Sharp, with Campbell and Moody, to whom he had assigned an interest in the ferry lease and franchise, took from Robert J. Murray a lease of all his right in the Wall street slip for ten years, at the annual rent of $4000. But an agreement was executed at the same time between the lessor and lessees, providing that all rights and payments under the lease should finally depend upon the result of the suit then pending between the parties. On the 16th of September, 1852, the plaintiff assigned an undivided half of his interest under the ferry lease of July 1, 1852, to Freeman Campbell and Rutherford Moody. On the 1st of December, 1853, Sharp, Campbell and Moody assigned the corporation and Murray leases, and executed a bill of sale of all the ferry property to Leroy & Pierrepont, who represented the Union Ferry Company. On the 23d of January, 1858, Campbell and Moody assigned to the plaintiff all right or cause of action, either against Murray or against the corporation, which had accrued to them in relation to or connected with any of the leases of the Wall street ferry.

The answer set up several defenses: 1. It denied that the

representations were made *by the defendants ;* 2. That, by
an agreement made after the lease, the rent was reduced to
$5000 per annum; 3. That such reduction was made in
consequence of the claim to the north side of the slip, and
for other causes, and was a satisfaction, discharge and ex-
tinguishment of the claim of the plaintiff. On the trial,
the evidence of the plaintiff consisted of the following par-
ticulars : *First.* Maps belonging to the city, found in the
street commissioner's office, which laid down the whole slip
as belonging to the city, and which were shown to the plain-
tiff by the deputy street commissioner, when he went there
to see what property the city claimed, in order to make a
voluntary application for a lease of the ferry, after other
parties had made an offer for it. *Second.* Statements made
to him by individual members of committees of the different
boards of the common council, to which the applications for
a lease of the ferry (including the plaintiffs) had been referred,
and prior to making their reports and the passage of the
resolution granting the lease. *Third.* Statements made to
him by the comptroller of the city and the corporation
counsel when he took the lease and signed the counterpart,
explaining the clause in the resolution leasing only the right
which the city had in the slip. *Fourth.* Two resolutions of
the common council, passed *after* the lease had been taken and
before much expenditure was made, directing a survey of the
slip and the ascertainment of the extent of the rights of the
city in it, and the making of such survey. All this evidence
was objected to as incompetent: 1. Because the complaint
did not allege any fraud or indeed any cause of action.
2. Because the lease could not be controlled by parol evidence
of facts or declarations, prior to its being given. 3. Because
it could not be controlled by the resolutions and surveys
subsequent to its being given, nor any cause of action estab-
lished thereby ; and, in addition, when the plaintiff rested,
a motion to dismiss the complaint was made upon several
grounds, comprehending all these and other objections, which

was denied, and the defendants excepted to the several rulings of the court.

. In respect to the alleged false representations, the judge, among other things, charged as follows : " The plaintiff made an application to the common council for this lease, apparently for the whole of this slip,. contemplating, we may presume, a possession and acquisition by the lessee—if he got the lease—of the whole of this slip. As I stated yesterday, the common council might have considered this matter before the council themselves ; and then the parties would stand in the light of parties treating for this lease—negotiating with regard to this contract—and they would be responsible for representations made, if they were positive and affirmative in their character, and *intended* to be relied upon by the other side, and *actually* were relied upon by the other side, for the purpose of controlling his action in the contract subsequently made. Would not this be so, if these parties had negotiated in the presence of each other—in the presence of the common council and the plaintiff ? And if it would be so with regard to the common council, acting in their official capacity, and the plaintiff, I think it must be so in the presence of the committee, upon whom the council had devolved the duty which belonged to themselves ; for I am not aware that there was any limitation or restriction on the power of the committee, who were authorized to treat upon this subject ; and although the action of that committee was not intended to be conclusive in itself, without further action in the council, yet, I think, we must regard their action—the action of the committee and the action of Mr. Sharp, during their interview, while they were acting in reference to this intended contract—as the action of, and we must regard them in the light of, antagonistic contracting or negotiating parties, who are to be held responsible for the truth of the material representations which they made, which were likely, and *intended*, to affect the action of the other party. Now, if the committee, at this time—and this is a question for you to determine, gentlemen—made to Mr. Sharp actual, posi-

tive, affirmative representations that the defendants owned the whole of this slip, with the exception of this little triangle at the northwest corner, and, upon the faith of representations of that character, intended to influence his action, he made the offer of $20,000 for this lease, then, I think, the committee were bound by those representations, unless the effect of them was in some way altered or avoided by the terms of the lease itself. *You* must judge what these representations were. Were they positive, affirmative, statements of fact, or were they mere expressions of opinion, on the part of these members of the council, of this committee, in regard to the character and territorial extent of this title ? If they were the latter, if they were mere averments of belief of individual members of that committee, of the title of the defendants to the whole of this slip, with the exception of this triangle, then, in my opinion, they are not representations for which the defendants can be held responsible in this suit. If, on the other hand, they were statements of the actual title of the defendants, and of the extent of that title, positive and affirmative in their character, and naturally calculated to operate upon the mind of the plaintiff in consummating this contract, or as to taking it at all, and as to the amount of rent which he would agree to pay for the lease of this property, and which he did, in point of fact, confide in, and rely upon ; then, if they were false and fraudulent in their character, fraudulent in a sense to which I shall refer hereafter, and resulted in damage to him, they are responsible to him for that damage. I believe that to be the law of the land, and on that point you must accept it as the law of the land, determining for yourselves this question, whether they were positive representations of fact, or mere expressions of opinion. . There is another aspect of the case, and perhaps two others, to which I ought to call your attention. One is, what transpired at the time of the delivery of this lease ; contemporaneously with it, or immediately preceding its delivery, on an occasion a few days preceding the delivery. It would seem, from the evidence of

Mr. Sharp, that he was not satisfied with the terms of this lease. The terms provided for the demise of this slip on the northerly side of this pier 15, but saying nothing of the southerly side of pier 16; it says: 'Or so much thereof as belongs to defendants;' and, from the very character of that lease, it would naturally raise a doubt, whether the defendants intended to demise the entire slip. Because, in the first place, it made no allusion to the northerly pier, the southerly side of which would necessarily be in this slip, and it qualified the language previously used, by saying: '*so much thereof as belongs to the defendants.*' Now, this might naturally raise a doubt in the mind of the other contracting party, as to what the defendants intended to convey, and he wished that doubt resolved. He says: What does this mean? The corporation counsel had, in very much the language which the resolution of the committee implied, drawn up this lease as of the slip, '*or so much of it as belongs to the defendants.*' It would be much more potent for instruction if he had not followed it out, by adopting that language, but had put in the lease itself certain language, marking it out by distinct and actual boundaries. But the corporation counsel employed the precise language which the committee had previously employed, and drew the lease, as a lease of the slip, *or so much thereof as belongs to the defendants;* leaving it still a matter of doubt, still uncertain upon the face of the paper, how much this lease would cover; and it would devolve upon the plaintiff the necessity of ascertaining, from other sources, what was the territorial extent of this right. The lease itself did not declare it; it left it in doubt, ambiguity and uncertainty. The plaintiff was not satisfied, and he said: 'You say, *so much as the corporation owns :* what do they own? What do you mean by saying, *so much as the corporation owns ?*' Then these parties (the corporation counsel and the comptroller,) as he alleges, said to him: 'We mean to include every thing except the triangle at the northwesterly angle; we have control of the entire slip,

except this portion.' You are, however, to judge of the effect of this language. It is for you to determine upon this, as upon the other branch of the case, what was the language employed by the comptroller and the corporation counsel. What did they say in point of fact ? Was what they said in the nature of a *mere opinion* expressed by them, as to the extent of the right of the corporation ; or, was it an affirmative allegation as to the territorial extent of the property of the defendants in that slip ? If it was the latter, and if it embraced, in terms, the whole of this slip, except the small triangle formed by the continuation of the Murray line, then, it appears to me, the defendants are responsible for that representation, whatever it may be. Because, although the corporation counsel and the comptroller are not in themselves, necessarily, the defendants, yet they were prominent officers of the defendants ; officers naturally having in charge, it seems to me, the business of preparing the lease and of delivering it ; or, at any rate, appearing to be charged with the duty of putting that paper into the hands of the other party. The other party demands, under such circumstances, an explanation, or representation, as to the extent of the right of the defendants ; and I think that the corporation counsel and the comptroller, if they were charged with the delivery of this paper, must be presumed to have had authority to speak upon that subject, in regard to which the plaintiff sought for an explanation ; and, if they speak in a manner amounting to a positive and absolute affirmation of the exclusive right of the defendants to the entire body of water between these two piers, except the triangle, then, I think, the defendants are bound by it, as a representation. I think it was calculated, but you must judge whether it was intended, as a representation upon which the other party was to rely ; and in point of fact whether he did rely upon, and was thereby induced to accept this paper ; and that he would not have accepted this lease except upon the absolute declarations thus made of the territorial extent of the rights of these

defendants." To the above portions of the charge, the de-
fendants' counsel excepted.

As to the resolutions of the common council of the 9th
September and the 4th October, the judge charged that if
they were "designed to influence the action of the plaintiff, and
did in point of fact influence the expenditures which he after-
ward made; and if they are of a character to amount to rep-
resentations of title, and of the extent of that title, in connec-
tion with the survey of Mr. Ludlam; then, you may consider
them to the extent, and for the purposes for which they were
actually entered into, and which they were actually designed
to effect."

On the question of damages, and as to the reduction of
rent by the common council, in 1853, the judge charged:
"The remaining question is, *Did the plaintiff sustain any
damage?* If you come to a favorable conclusion for the
plaintiff on all the previous questions—the fact of represen-
tations, the falsity of their character, and in regard to his
relying upon them—then the question is: has he sustained
damage by the false representations of the defendants? He
claims to have sustained damage in this way: he wanted to
run a ferry, and took a lease for the purpose of running a
ferry, and he agreed to pay $20,000 rent and agreed to main-
tain a ferry, by a contract with the defendants themselves;
and he was disabled from running the ferry, as he claims, by
reason of the loss of a considerable space in this slip, which
is claimed to have been absolutely indispensable to the main-
tenance of a ferry. I am not aware that there is any material
contradiction of the evidence on that subject, that this por-
tion of the slip, which was afterward found to belong to Mur-
ray, was necessary for the maintenance of a ferry. If this be
plain, on the part of the plaintiff, it makes out a case, and
the only remaining questions to be considered are: *Have the
defendants made out a defense, by the evidence which has
been introduced with regard to the reduction of rent?* and,
if not, *What is the amount of damage which the plaintiff is*

Sharp *v.* Mayor &c. of New York.

*entitled to ?* Now, assuming you to come to a conclusion in favor of the plaintiff, the next question is : *Has this claim been released and discharged in any way by Sharp ?* In 1853, he presented a petition to the common council, asking for a reduction of rent, founded upon the idea that the ferry was not remunerative in its character, and that the receipts came very far short of the necessary expenditures which he had been obliged to incur ; and he put forth this as an equitable reason, addressed to their sense of justness and fairness, for a reduction in the amount of rent. This is all, he says, which he did, unless it was, to exert some influence to procure this reduction. He says he did not state at this time to the common council, or to the committee, that he had a cause of action, or intended thereafter to avail himself of a cause of action, such as is now prosecuted before you ; and it is claimed, on the part of the defendants, that this was a concealment of an important ingredient which would enter naturally into the consideration of the common council, as among the motives which might influence them in this reduction of rent ; and that the concealment of this claim, or cause of action, from the common council, vitiates the claim of the plaintiff in this suit. I do not so regard it *in point of law.* If we were sitting in a forum of conscience, it might be a question whether it would not have been more proper, and equitable, and fair, on the part of the plaintiff, to have presented this fact to the consideration of the common council—whether it would not have been more judicious and more frank to have enlightened them with regard to this claim, if he had then conceived the idea of its prosecution, so that the common council might act in full view of all the circumstances which should naturally or legitimately affect their action ? Yet I am not prepared to say, as a *matter of law*, that the plaintiff was obliged to present this question to the common council. It was, in its nature, a distinct and independent cause of action, and the plaintiff claimed he had abundant cause for the reduction of this rent, on account of the non-remune-

rative character of the ferry; and there were presented ample reasons in that circumstance for this reduction of rent to the standard of $5000, instead of $20,000; and that he was not obliged, as a matter of law, to introduce this claim to the common council; and that he made the application rather as a suppliant, as it has been spoken of here, than as a strict claimant, enforcing a legal right from them. It does not appear to me that his omission to present that to the notice of the common council is a bar to this action." * * *

"If you come to a conclusion favorable to the plaintiff, the only remaining question is: *What amount of verdict is he entitled to at your hands?* If he was entitled to the whole of this slip, and received through the lease only a part of it, then the damage, which he sustains, is the difference between the value of the whole and the value of the part which he got under the terms of this lease; in other words, the value of the part which Murray owned, and which the plaintiff claims he was obliged to procure, in order to carry out his contract with the common council, in running this ferry. This value is placed at the amount of four thousand dollars, and Mr. Murray swears that is a fair annual compensation for the use of the premises owned by him. The plaintiff alleges he was obliged to pay that sum, in order to obtain the use of the slip, which was indispensable, and it is claimed, and I think correctly and legally, that the amount which he was necessitated to pay, in good faith, for the purpose of obtaining that portion of the slip, is the measure of damages which he is entitled to recover in this action. That would be $4,000 a year for the period of time which would elapse from the commencement of the lease, in 1852, to its termination; that amount, according to the calculation of the accountant, Mr. De Groot, including the two odd months, would be $49,502.78, and I think the party is entitled to recover for the whole period. and that the rent does not cease at the last quarter day in May, but the two succeeding months would be among the

number for which the party would have a right to collect the rent."

The jury found a verdict for the plaintiff, according to the charge of the judge, for the whole amount of the rent agreed to be paid by the plaintiff and his associates, for the rent of that part of the slip which was claimed adversely to the city by Murray, during the whole term of the lease, and interest, being $49,902.78. Judgment having been rendered on the verdict, with costs, the defendants appealed.

*Wm. Curtis Noyes,* for the appellants.

*David Dudley Field,* for the respondent.

BARNARD, J.   It must now be regarded as settled that if a party makes representations in such manner as to import a knowledge in him of facts, whilst in fact he has no knowledge of the facts, and the representations are made with the intent that another shall rely on them, and that other does rely on them, and those representations turn out to be false, it is as much a fraud as if the party making them knew them to be untrue.   (*Bennett* v. *Judson,* 21 *N. Y. Rep.* 238.)

Upon this principle (the character of the representations, the reliance of the plaintiff on them, the falsity of them, and whether the plaintiff was damaged thereby, having been submitted to the jury and by them found in the plaintiff's favor,) the defendant here is clearly liable, provided the committee had authority to bind it, and provided there is no objection to a recovery by reason of the frame of the complaint, and also provided the oral proof of the representations introduced does not fall within the rule prohibiting a written instrument from being altered, varied or modified by parol evidence.

As to the objections to the form of the complaint.   This is on the ground that the complaint did not state any fraudulent, willful or intentional misrepresentation.   The complaint however states the representations that were made, stating

them as representations of facts made by the defendants of their own knowledge, and not as expressions of opinion or belief; that those representations were false; that the plaintiff relied on them; and that he suffered damages thereby.

Proof of these facts would be sufficient to entitle the plaintiff to recover, unless the defendant could in some mode justify the representations. Upon these facts the law adjudges fraud. It would undoubtedly have been more in consonance with the verbiage of the former system of pleading to have alleged fraud; but it seems scarcely necessary now to put in a pleading these sounding phrases which are the mere result adjudged by the law to arise on the facts alleged. But the omission of such an allegation as this does not substantially vary the cause of action. The whole frame of the complaint clearly shows what the cause and nature of the action was intended to be. If material the complaint could have been amended at the trial by inserting this allegation as an allegation material to the cause of action mapped out in the complaint. In such case a judgment will not be reversed although the amendment has not been actually made.

As to the objection that oral proof of the representations is inadmissible, on the ground that it tends to contradict &c. the written lease. This evidence was offered and admitted not for the purpose of showing that it was intended to pass something which by the terms of the lease was not passed, but for the purpose of showing what the terms of the lease would have passed, if the representations had been true. In this view the objection to this testimony, on this point, that a written instrument cannot be contradicted &c. by parol evidence, is untenable. (*Whitney* v. *Allaire*, 1 *Comst.* 308.)

Indeed the case of *Whitney* v. *Allaire* is almost identical with the present case. That action was covenant brought for rent on an instrument in the following words: "I have this day hired of Stephen Whitney the water lot and his right to the wharf on the east side of Market slip, for one year from 1st of May next at the yearly rent of $1000, and

taxes on said water lot whatever it may be, the rent to be paid quarterly, 9th February, 1837." The defendant claimed damages by reason of representations made by the plaintiff respecting the extent of his right. Parol evidence was admitted to prove the representations, and such admission was held proper, notwithstanding the objection that the plaintiff demised *only his right.* There is no essential difference between the expression "all my right" and the expression "so much as belongs to me."

As to the authority of the committee to bind the corporation by representations. In *Sandford* v. *Handy,* (23 *Wend.* 267,) the defense consisted in false and fraudulent representations as to the cost, location and value of certain property made by one who was the plaintiffs' agent to effect a sale of the property. On the trial the evidence of the representations was excluded. On appeal the evidence was held to be admissible. The court, in its opinion, says: "If the agent at the time of the contract makes any declaration, representation or admission touching the subject matter of the contract, it is the representation, declaration or admission of the principal. These principles are fully borne out by the authorities referred to, founded in good sense and with a just conception of the commercial and other business transactions of life from which they have been derived." And again the court say: "The agent here had power to procure the subscription to the contract of sale, and in the absence of special instructions to the contrary, at least, does not this imply the right to use the ordinary means and inducements to accomplish the end? Must not the plaintiff have expected that the agent would speak of the property, its situation, quality, etc?"

"This is laid down as a general principle, and upon reason and authority is applicable to both special and general agents."

And the point having been raised that the principal should not be held responsible for misrepresentations, as no authority to deceive and defraud can properly be implied as one of the

means, the court say : "There is undoubtedly much force in this view, and at a very early day it carried with it the judgment of the court. (*Bro. Abr. Action on the Case, pl.* 8.) But Lord Holt overruled that decision and held him liable. This has been approved law ever since."

Again, in the case of the *Bank of the United States* v. *Davis,* (2 *Hill,* 451,) this language is held : "Nor is there any thing novel or singular in the idea that an agent may be guilty of fraud and deception in transacting the business of his principal, or in the law that holds the latter responsible for the consequences, to third persons. The doctrine is very familiar and of every day application in the administration of justice." No authority has been cited overruling these principles. Thus, unless a different rule obtains where a corporation is principal, the defendant here is bound by the representations of its committee. There can be no doubt but that the representations here were such as touched the very matter with which the committee was charged ; equally so with the representations in 23 *Wend.* Now does a different rule obtain in this respect when a corporation is principal ?

The general principle that a corporation may delegate to agents the performance of any act which it can itself perform, is well established. Now there is no doubt but that the corporation might itself have entered into negotiations respecting the leasing of the slip, and have settled on the terms. *That* power then it could confide to its agents. Can there be any doubt but that if the corporation had negotiated this lease, and in the course of such negotiation had made these representations, it could escape liability on the ground that it had no power to make them ? The granting to a body aggregate certain powers, rights and privileges which it may use, possess and enjoy, will not give that body immunity from wrongs or unlawful acts committed by it in the carrying out of those powers, or in the execution of any act it may be authorized to perform.

The suggestion that a corporation cannot be liable for a fraud committed *may* be correct as to fraud not in any way connected with or committed in the course of, and tending to carry out, some power or act which it is authorized to perform. But it is not correct as to fraud so connected or committed.

A fraudulent representation is in effect a wrongful and unlawful action. And the argument is that a corporation has no power to commit a wrongful or unlawful act, and having no power to commit it, it is not liable therefor. But it is held that a corporation may be sued for an unlawful conversion of goods, and damages recovered if it be found to have unlawfully converted them. (*Beach* v. *Fulton Bank,* 7 *Cowen,* 485.)

So, also, it may be sued and damages recovered for an unlawful refusal to permit stock to be transferred. (*Bank of United States* v. *Davis,* 2 *Hill,* 451.) In these cases the argument that the corporation was not invested by its charter, or by its stockholders, with power to commit any unlawful act or wrong, and that it could not by any wrongful or unlawful act affect the interests of the stockholders, was applicable to the same extent as it is in the present case; and those arguments were strenuously urged in the case in 7 *Cowen.*

It is urged that a corporation will not be affected by any representation made by an agent, unless the agent was directly authorized by resolution to make the particular statement. The principal is liable for the false representations of the agent made in and about the matter for which he was appointed agent, not on the ground of express authority, given to the agent to make the statement, but on the ground that as to the particular matter for which the agent is appointed he stands in the place of the principal, and whatever he does or says in and about that matter is the act and declaration of the principal; for which the principal is just as liable as if he had personally done the act or made the declaration.

The power of the agent to render the principal liable for representations flows from his mere appointment to do the

act or transact the business in and about which the represen-
tations are made. This is clearly the doctrine of the case in
23 *Wend.* There is no principle of the common law by
which the incidents attaching to the appointment of an
agent, when that appointment is made by a corporation,
are more restricted than when the appointment is by an
individual.

No train of reasoning has presented itself which leads to
the conclusion that there is any necessity or propriety in
establishing the doctrine that when an agent is appointed by
a corporation the incidents attaching to that agent are more
restricted or of a different nature than in other cases. It is
not meant to be asserted that a corporation can bind itself
in all matters to the same extent as an individual can, or
that by the appointment of an agent it can bind itself in
matters as to which its own act would not bind. But it is
meant to be said that where a corporation has power to do
some act, and as incident to that act, to render itself liable
for representations made in and about the doing of that act,
it can appoint an agent to do that act, and from the mere
fact of such appointment the same powers will flow to the
agent as if he had been appointed by an individual, provided
only that the powers so flowing could have been exercised by
the corporation itself.

In this case the corporation had power to negotiate a lease
of the slip, and in the course of such negotiation to render
itself liable for any misrepresentation made in relation thereto.
It had also power to appoint an agent to conduct such nego-
tiation, and from such appointment there flowed to the agent
the power to render the corporation liable for any misrepre-
sentation.

As to the representation made by the comptroller and
corporation counsel. The point made by the appellant that
the plaintiff took the lease with knowledge given him by
its terms that there was a question as to the extent of the
defendants' right, is fully met by the evidence of what took

place between him and the comptroller and the corporation counsel. In this view that evidence was certainly proper. The resolutions of September 8, 1852, and 4th October, 1852, and the survey of Ludlam, were properly received in evidence, for the reasons mentioned by the judge who presided at the trial, in his charge to the jury. This survey, and these two resolutions, were also admissible in another view, viz: to show ratification.

Shortly prior to Sept. 8, 1852, the plaintiff communicated to the defendants' officers the fact that his possession of the property which had been represented to him to belong to the city was obstructed. The defendants then passed a resolution directing the property to be surveyed. It was surveyed, and the surveyor made a map representing the property to belong precisely in accordance with the representations made to plaintiff. Thereupon, on the 4th October, 1852, another resolution was passed, reciting the survey, and that the lessee had been obstructed in obtaining possession, and directing the common council to put and keep the lessee in possession and enjoyment of the property, as laid down on the map. Reasonable intendments and presumptions are to be drawn from the acts, whether of individuals or corporations. Now, it is rather extraordinary, if the common council had not deemed the corporation obliged, in good faith, to protect the plaintiff in the possession of the whole of the premises, that this course should be pursued. If the only information on the subject which they had was what appears by the terms of the lease, they would at once have said what their counsel now urges us to say for them, " we only leased you what we owned ; we neither contracted to put or keep you in possession of any specified portion of the slip ; you took the lease on your own responsibility, being well apprised that there was uncertainty as to the extent of our ownership. We are not obliged, either in law or in good faith, under these circumstances, to enter into any litigation on the subject." If, on the contrary, they were informed of the representations made

by their committee, it was very natural for them to say : "true, those representations were unauthorized, but you took the lease relying on them, and we consider ourselves bound by what our committees have represented, and will therefore do all in our power to put and keep you in possession of what our committee represented we owned." It can be readily imagined that this was the line of argument urged in the debate respecting the adoption of these resolutions.

The reasonable presumption and fair intendment is, that the common council, when they passed these resolutions, knew of the representations that had been made, and passed the resolutions in view of them. This is a ratification of the act of the committee in making such representations. This was the time for the defendants to rescind and make restitution. But instead of doing that, they chose to contest the claim of Murray, and by the passage of these resolutions not only ratified the representations of their committee, but in effect again represented that they owned the property.

These views dispose of the objections to the admission of evidence of the representations made by the committee ; of the resolution directing a survey ; of the survey ; and of the resolution of October 4, and of the first eight points made by the appellants, except the objection to the representations made by the street commissioner. This, if an error, is cured by the charge of the judge, who in effect directed the jury to disregard it.

There are two remaining points urged by the appellants. 1st. That by reason of the plaintiff's application for a reduction of the rent, after the representation and after he knew of the adverse claim, and his acceptance of the reduction and the instrument by which it was made, he cannot recover ; and this is urged on three grounds.

(1.) That the reduction was in fact made in part by reason of the adverse claim. (2.) That the plaintiff in his petition suppressed the fact of this claim, which suppression must be deemed fraudulent. (3.) That by accepting the instrument

reducing the rent, he, knowing of the representation, has af-firmed the lease to be good in every respect. The charge of the judge is very satisfactory on these points ; but there is an additional reason why they do not form an answer to this action. At the time of the application for a reduction of rent and of the acceptance of the instrument reducing it, the de-fendants were defending against the plaintiff, in a suit brought in respect to this piece of property, which had not then been tried. The plaintiff's calling on the defendant to put him in possession of the land which had been represented to belong to it, and to protect him therein, was a clear assertion of an intent to hold it responsible if it was unable to give him what he ought to have. The defendants, by the resolutions of September 8, 1852, and October 4, 1852, and the defense of the suit brought by Murray, for the reasons stated when speaking above of those resolutions, recognized the liability. Pending that suit, both parties must have considered the claim as in abeyance. Consequently there was no conceal-ment, nor could the acceptance of the subsequent instrument be a waiver of a claim considered by both parties to be in abeyance.

With respect to the objection to the rule of damages, it is only requisite to refer to the views expressed by the judge on the trial.

The judgment should be affirmed with costs.

SUTHERLAND, J. concurred.

CLERKE, J. (dissenting.) This action must be regarded either as an action *ex contractu,* for the breach of an implied or an express covenant in the lease, or as an action *ex delicto* for fraudulent representations.

I. That it is an action *ex contractu* is, I believe, scarcely pretended. The lease so clearly provides, on the part of the defendants, against any liability of this kind, that it can scarcely be maintained for a moment that such an action

could be sustained.  The lease demises only so much of the slip as belongs to the lessors, and in the concluding clauses "it is mutually covenanted and agreed that these presents are upon the express understanding that nothing herein contained shall be taken or construed to operate as a covenant by the parties of the first part, for possession or quiet enjoyment by the party of the second part, &c., of the said ferry or right of ferriage, nor shall the same be taken or construed to interfere in any manner with any previous grants or rights &c., nor to operate further than to grant the possession of the estate, right, title or interest, which the parties of the first part may have or lawfully claim, to the said ferry or right of ferriage hereby demised, by virtue of their several charters and the various acts of the legislature of the state of New York."

II. Can this action be maintained on the ground of fraudulent representations ?   I presume that a corporation is not exempt from liability for misrepresentations which affect the rights of individuals ; and a purchaser or lessee of property belonging to a corporation, if he is deceived and enticed into making a contract by the misrepresentations of the corporation, and is damnified by such misrepresentations, can maintain an action against it.   But nothing is better settled in the law than that the declarations of any individual member or officer of a corporation will not bind it, unless they are within the scope of his ordinary powers, or of some special agency relative to the subject matter.   Even declarations made by the mayor himself, or declarations in any form, made by any one branch of the common council, could have no such effect ; much less can it be bound or affected by the declarations or acts of committees or individual members of committees, not expressly authorized by the whole legislative department of the corporation to make those declarations or perform those acts.   Otherwise there would be no safety for a day, for the rights of any corporation ; and notwithstanding all the restrictions and care with which the law surrounds those rights

we all know to what an extent they are trifled with and bartered away by faithless officials and unscrupulous claimants. I therefore consider that all the acts and declarations of the officers of the defendants, in the present case, and of committees and of individual members of committees, were totally inadmissible as evidence, and that the judge erred in admitting them. Indeed I think the defendants were clearly entitled to a dismissal of the complaint, when the plaintiff rested his case. The judgment should be reversed and a new trial granted; costs to abide the event.

[NEW YORK GENERAL TERM, May 4, 1863. *Sutherland, Clerke* and *Barnard*, Justices.]