By the Court, Robertson, Ch. J.
The fraudulent representation on which the case depends, which was put at issue by the pleadings, was the assertion of the defendant that a Mr. Stewart, against whom he held the claim mentioned in the complaint, sold by him to the plaintiff, was “ wealthy and abundantly responsible for any judgment that might be recovered against him.” The referee found that he had made a somewhat different representation, to wit, '“that Stewart was perfectly good, and if any judgment was recovered against him, there would be no difficulty in recovering the money ;” also, that “he was very rich, very wealthy.” And, again, on a subsequent occasion, when executing the assignment, the defendant, addressing the plaintiff, said: “If you can get a judgment you will have no difficulty in getting the money.” The referee also found as fact, not only that such representations were false in fact, but that Stewart, when they were made, “was greatly embarrassed, in insolvent circumstances, and unable to pay his debts.” Yet he also found that “ there was no evidence tending to show that the defendant knew them to be false,” or that he “ did not *9 believe all that he uttered, touching the responsibility of Stewart.” But, (by way of qualification of such previous findings,) that the defendant did not exercise ordinary care and prudence to ascertain whether they could be made “ with truth.” Unless, therefore, the failure to exercise such prudence amounted in law to a fraud, the defendant' stands acquitted by the' report, of all fraud or evil intent, at least so far as his belief is concerned.
Uncontradicted evidence in the case shows that the defendant had some reason to believe his statements of Stewart’s means true. He had seen- his residence, with its furniture, ornaments and works of art,' his style of living in luxurious ease, maintaining horses and carriages. He also knew that he had lately received $150,000 for two steamers sold by himself for him. And there is no evidence in the case to show that he had any reason to suppose that insolvency lurked behind such a goodly outside show, or to doubt the reality of the wealth, it seemed to indicate. The referee therefore, having gone so far, should have gone farther and stated what there was in the caseto impose upon the defendant any duty of making further inquiries before he ventured to make the statement he did; but his report is silent as to the extent of the defendant’s knowledge .of Stewart’s affairs, the circumstances which should have prompted him to inquiry, the resources which lay open to him for investigating Stewart’s condition in February, 1860, including the publicity or privacy of the real state of his affairs, which were proper elements of forming a judgment as to the propriety and success of further inquiry. The referee might, therefore, have gone further than he did, by finding not only that the defendant believed his statements to be true, but -had some reason to do so, and none to think the contrary: Yet he seems to have considered his finding of want of proper eare and prudence in the defendant in verifying his statements before he made them, as antagonistical to the beneficial effects of acquitting him of guilty knowledge of their falsity. This would not be its legal effect, *10 unless a person who makes a statement of a fact connected with the subject of a sale, in general terms, founded upon what warranted a belief in his truth, is bound to set out upon a new investigation to discover whether it is accurately and literally true; in other words, whether he actually warrants it to be true. When a person trusts to a representation he trusts to the honesty of the party making it; if he wishes more he should require a warranty. If any circumstance of suspicion had come to the' defendant’s knowledge tending to raise a doubt as to the truth of his general statement, he was bound either to disclose it or investigate it to its source; but there was no proof of any, in this ease. I am at a loss, however, to understand upon what principle, a party, having some reason to .believe a fact to exist and none to raise a doubt of its existence, is under any obligation to investigate further the proofs of its existence, before he can with safety venture to state that it exists, or his belief in it. If he has such reason, and none to the contrary, his statement can never be fraudulent, however false it may be. The ordinary business of life could never be carried on, if such responsibility rested on every man who made a statement of a fact.
But if the referee intended not only to find the insolvency of Stewart, but also supposed of inferred his condition to be either so publicly known, or with such inquiries as a man of ordinary prudence would make, likely to be discovered, it becomes necessary to sift the evidence as to such condition, its causes and its and their publicity, or secrecy, since the mere fact of embarrassments does not necessarily imply that insolvency could be discovered by ordinary inquiries in the face of the apparent possession of wealth.
Six witnesses living at the former residence of Stewart (Detroit) and far distant from the residence of the defendant, were examined respecting the actual and apparent pecuniary condition of the former. Four of them (Gray, Romeyn, Pond and Jerome) were practicing lawyers there, and all of them appear on different occasions to have been *11 consulted by him professionally, and derived the far greater part of their knowledge of his affairs mainly, if not entirely, in consequence of the confidence necessarily reposed by him in such professional capacity. They .were allowed to give as evidence their opinions, derived from such information, of his insolvency at the time of making the representations in question, and three of them were permitted to add to them knowledge acquired afterwards. Gray only acquired “a full and thorough knowledge of his debts and property” in the early part of 1861. Romeyn (who was his counsel from 1858 to 1861,) gave some details of some suits against him in 1857 and 1858. Pond was retained by him in August, 1860, (until which time he had no special knowledge of his affairs,) to defend a suit against him, on a mortgage given in 1857. Jerome looked into his affairs with him in November, 1859. Gray, after testifying that “ Stewart, for a number of years, was reputed to be a man of great wealth, constantly engaged in extensive operations,” owning “a large amount of property” and owing a large amount of debts; that ufor many years after ” he “ first knew him (1847) his credit was good, and he was generally deemed good and responsible,” stated, that “a short time before 1860 his credit began to fail in general estimation.” Romeyn, after describing him to be, in 1858, “ a man controlling large resources, but in bad credit, not paying his paper at maturity and constantly embarrassed,” stated that his “ dwelling house was mortgaged prior to 1860,” and that in May, 1860, “ he executed a chattel mortgage on his household furniture, plate, pictures, ¿•e. to secure * * more than $20,000.” He further stated that Stewart’s paper had been “under protest for large amounts; in 1857 he was sued * * in a case where some $10,000 was recovered; * * early in 1858, there were suits against him on commercial paper.” Pond, after-stating that “ up to about the year 1859, Mr. Stewart was reputed to be wealthy, and was engaged in large business transactions,” added, “in the latter part of the year 1859, he became much embarrassed in his pecuniary circumstances. His paper was dishonored and suits were brought *12 against him thereon, and his circumstances continued to grow worse, till the time of his death.” He acknowledged, however, that his “ knowledge of Mr. Stewart’s affairs, before the summer of 186.0, was very general and derived from” others. Jerome thought Stewart was “in bad credit in February, 1860, and for a considerable while before.” Mr. Ward,' (apparently an intimate friend) who was constantly consulted by Stewart respecting his affairs, previous to February, 1860, after saying of him, “ he was then a man of large business operations, but in poor credit,” added that he “ pledged all his available property as collateral security.” Stewart’s confidential clerk, (Sanger,) who was also manager of a bank, of which the former was the principal owner, after stating him to be a “ large borrower of money, who did not meet his paper promptly or pay his employees, or for improvements made on his property, to a large amount,” admitted that prior to 1860, “he had large amounts of property in his hands,” although heavily encumbered, and “ of which he had never paid all the purchase money.” But he further testified that suits were constantly brought against him on overdue paper of his,” and that he was “constantly living * * on borrowing money from one man to pay another.” An execution levied upon his household furniture in 1858, was paid by his friends. This, with the testimony of the defendant already alluded to, constitutes all the evidence of Stewart’s real and apparent condition in 1860, and all the means presented to a stranger for discovering the former, except the opinions of his counsel, already referred to (which are objectionable as evidence, in any aspect of them,) and testimony relating to dates after February, 1860. It, however, raises the question, with such external indicia of wealth and apparently continuous prosperity for several years, what means might, could or would any ordinarily prudent man have adopted, if any, to have ascertained its reality, before he asserted it, on the sale of a claim against him.
In answering such question, it is proper to notice of what *13 property by the evidence, Stewart appeared to be the owner about February, 1860. He occupied a well appointed dwelling house, (his own, although mortgaged,) containing furniture and .works of art, on which, in May subsequently he was able to borrow $20,000,. the whole fully sufficient, unless encumbered, to pay the claim of the plaintiff. He had either towards the end of 1858 or in 1859, received $150,000 for the steamers sold for him by the defendant. He owned the property mentioned in the complaint, in this state. He was “ chief owner ” of “ The Peninsula Bank.” According to his confidential clerk, (Sanger,) “ he had considerable amounts of property in his hands.” According to Gray “he owned a large amount of property.” And according to Romeyn, in 1858, “ he controlled large resources.” He lived expensively, and kept horses for his private use. ■ His credit, as stated by Mr. Gray, for many years after his first acquaintance with him, (in 1847,) was good, “he was generally deemed good and responsible.” “ He was reputed to be wealthy, (Pond states,) up to 1859.” It was at the end of that year, his inextricable embarrassment seems to have begun. “His credit,” according to Gray, “began to fail a short time before 1860, “ in general estimation.” It was not, however, until 1861, the latter discovered Stewart’s insolvency. His furniture seems to have remained unencumbered until May, 1860. The time when “he became much embarrassed in his pecuniary circumstances” from which onward they gradually grew worse, is also fixed by Mr. Pond' as being “ the latter part of 1859.” The same witness, however, admits that he was not sued for a mortgage given in 1857, until three years after it was given, (August, I860,) and three suits against Stewart, which are the only ones he specifies, were not brought until the spring, and in April and September of that year respectively. . Although urged to make an assignment in February, 1860, by his friend and adviser, Ward, he réfused to do so. Mr. Jerome, who in November, 1859, on a thorough examination, had found his assets to fall $200,000 short of *14 his liabilities, merely says vaguely and in general terms: “In February, 1860, he was not a man of wealth, and had not been for many months previous thereto. He was in had credit then, and had been so for a considerable while.” Even Romeyn only fixes his “open and avowed insolvency” as occurring “ subsequent ” to February, 1860, although he says “ the causes which resulted in ” it “ existed then,” and he apparently traces them back to 1857 and 1858, when he admits “ he controlled large resources,” although ' “ in bad creditf not paying his paper at maturity and constantly embarrassed.” This hardly coincides with the testimony of Gray arid Pond, -and can only be explained by the possibly more intimate knowledge of his affairs by Romeyn, and his occasional temporary difficulty of 'meeting engagements, which was subsequently overcome. He appears to have always commanded the confidence of his friends, either by his means or his capacity to redeem his affairs from temporary difficulty. They paid the execution on his furniture in 1858. As Sanger describes him, he was “a large borrower of money,” “he was constantly borrowing from ■one man to pay another;” and as Romeyn says, “he controlled large resources.” This accounts for keeping up his credit until 1860. He did not even then, apparently, dis-pair of being able to recuperate, as he' refused to make an assignment, and his creditors do not seem to have attacked him until April, 1860. The suits in 1857 and 1858, spoken of by Romeyn, must have been disposed of before 1860, or else lasted until after February of that year. At all events they did not interfere with the credit of Stewart as testified to by Gray and Pond. ■ But even if the defendant had discovered by diligent inquiiy, all the embarrassments of his debtor prior to 1860, he would not necessarily be bound to conclude he was not wealthy or able to pay his claim. Many a man in active business, who not only holds a large amount of property, but is actually wealthy, may, at least in this country, have it encumbered; be largely in debt, occasionally fail in his engagements and frequently borrow *15 large sums from his friends. Still more, who are reputed to be wealthy under such circumstances, but not in reality so, frequently rise by the chances of commerce, from such a state of tottering.equilibrium to stable fortunes. The true condition of the latter is rarely suspected, except by friends or those dealing with them. If not suspected, it is still more rarely discovered except by the uütiring vigilance of some constant spy or enemy.
It is very evident that- ordinary inquiries at Stewart’s place of residence, (Detroit,) would only have elicited the facts publicly known and already mentioned, of his possession of property, being in debt and borrowing money, and that his credit was good until 1860; whether he could have ascertained the change in the latter is .problematical, since the witnesses do not state how public the knowledge of his embarrassment was. I presume it would not be contended that the defendant was bound to examine the records of the courts of the state of New York, where Stewart did not reside, or even of Michigan where he did, to ascertain what suits had been brought against him,.or their fate, or have gone to all the notaries in the city of New York to have ascertained whether he had any commercial paper protested.
It is somewhat singular that the only witnesses introduced to prove the hollowness of Stewart’s appearance of wealth, were his four counsel, who had obtained their knowledge professionally; his friend, to whom in seeking his advice, he had laid bare his whole affairs; and his confidential clerk. I doubt very much whether, if the defendant had made inquiries of either, he would have been as successful as the plaintiff has been in procuring the required information. They probably would have been then loth to betray his confidence. No one of the external community, in which Stewart lived, has been produced, to show how much information could have been obtained by a resident of New York, by general inquiries in Detroit.
The report of the referee does not furnish us with any standard- or test of the ordinary care and prudence, which *16 he supposed the seller of an article ought to exercise in order to ascertain whether he could make any representation respecting it with truth; nor have I been able to discover that there was any thing peculiar in this case, which imposed the duty of inquiring into Stewart’s responsibility upon the defendant, before he made the representation in question. The defendant did not undertake to give any details respecting Stewart’s affairs; he merely states a general conclusion, that he was rich; and that the plaintiff would get his money if he recovered judgment against him. It is impossible to ascertain, what efforts the referee supposed the defendant ought to have made, in exercising ordinary care and prudence to ascertain Stewart’s real condition, although only bound to exercise such diligence as was ordinary. "With seeming outward solidity up to the very time of the representation, the hollowness of the prosperity of Stewart was known only .to a few confidential friends, employees and counsel, and not suspected by any of the public, until very shortly before such representation. It is, therefore, rather puzzling to know where the defendant should have begun his inquiries to verify his statement. The knowledge already possessed by the defendant, was such as ordinary prudence might have been satisfied with. I cannot, therefore, come to any other conclusion on the evidence, than that there were no inquiries, which a person of mere ordinary prudence would have been likely to make that would, except by accident, have given the defendant any more information than he had, and therefore, that if he had then, for the first time, obtained that information, he had obtained enough to warrant his making the representation he did, and there was no evidence to show that a man of ordinary prudence would require more. The finding of the referee, if he means to say the defendant could have discovered the untruth of his statement by the exercise of ordinary prudence, I therefore consider as unsupported by evidence as it is by probabilities.
*17 If, however, the referee held that there was any obligation on the defendant merely to make further inquiries without regard to their result, before he made the representation he did, he being warranted in, or having some reason for making it, from what he knew, it was a mistake of law. If there was any thing suspicious in what he knew, as I have said,' he was bound to disclose it or investigate the justice or injustice of his suspicion, but not otherwise. There is neither reason nor authority for any such doctrine, nor was it contended for on the argument.
The report of the referee finds in the alternative, that either the next day after the defendant received the plaintiff’s letter of the 17th of February, 1860, offering to buy the claim in question, (18th,) “ or in a previous interview, proposed to the plaintiff that he should take such claim,” and “ at the same time or times represented to the plaintiff that Stewart was -perfectly good, and if a judgment was recovered against Mm, there would he no difficulty in recovering the money, and in the same representations stated, “ Stewart is very rich—very wealthy,” and also at the time of executing the transfer of such claim, stated, “ If you can get judgment, there will be no difficulty in getting the money.” And also that “the plaintiff relied upon such representations, and was thereby induced to agree to discharge the indebtedness of the defendant, and accept “ such transfer as a consideration therefor.”. The referee, therefore, either meant to acknowledge an inability to determine which event preceded the other, the writing of the plaintiff’s letter or the making of the representations as found by him, or considered their sequence in order of time immaterial. I think, however, it will be found so material, whether such representations were made before or after such letter was written, that it becomes proper to examine the evidence in relation to it. The plaintiff, on his direct examination, (as a witness for himself,) stated that the negotiations for the transfer had been made some days before “it was executed, and although on such direct-examination he stated that the *18 defendant ” proposed 44 that he should take the claim against Stewart on the terms subsequently agreed to, he acknowledged that he could not “tell what the commencement was,” and on his cross-examination declared his inability “to say from which party the suggestion ' came.” The plaintiff had previously agreed to prosecute the claim on shares, as the defendant’s counsel. He further testified that he became satisfied in their “ consultations,” that the claim was a good one, oh the facts' as stated by the defendant. The latter represented to him “ that Stewart was perfectly good, and that if a judgment could be recovered against him there would be no difficulty in collecting the money.” He remembered the defendant’s expressions; they “ were very emphatic.” The latter “ said much more to the same purport.” The plaintiff, however, “ didn’t remember .the exact language.” The defendant said that Stewart was abundantly good, very wealthy, and had a great deal of property. He repeatedly made use of this at the time of the assignment. On the plaintiff’s.cross-examination, however, he thought 44 the conversation he had detailed, took place on the execution of the assignment.” On being asked to state all that he recollected was said on that occasion, he answered “ 1 am unable to state with distinctness more than this; I think on executing the agreement, on laying down the pen, the defendant said, if you get judgment you will have no difficulty in getting the money.” A witness for the plaintiff (Gilmore) stated he heard “ about the time of the sale and assignment ” in question, 44 and just previous,” one or two conversations between the parties, in regard to the wealth and solvency of Stewart. The defendant said he 44 was wealthy, very rich,” and if44 the plaintiff got judgment against him, he would be sure of the money.” This testimony is perfectly consistent with the fact that the defendant made such statements to the plaintiff, before the latter agreed to prosecute the claim in question on shares, and, as he says, during their consultations, which is highly probable from their relations. If that be so, it is hardly probable that the defendant found it necessary *19 to reiterate such mere general assertions of Stewart’s wealth in order to induce the plaintiff to purchase the claim. According to such testimony of the plaintiff, however, the whole representations are reduced to a single remark made by the defendant after executing the assignment, that the plaintiff would get his money, if Tie ■ got a judgment. The defendant, in Ms testimony denies ever making any proposition to the plaintiff to take the claim on his own account.
The plaintiff’s letter, however, of the 17th of February, 1860, contains in itself intrinsic evidence that it constituted all the negotiation, that was made for the sale afterwards concluded. The plaintiff' first speaks therein of the suggestion as coming from a third person (Dr. Patton) that he should buy the claim, as something entirely novel, and gives the reasons urged by such third party why it was advantageous for the defendant to sell the claim, to which the plaintiff' had assented; but declined risking any thing beyond his own claim, and had thereupon merely informed Dr. Patton of his previous arrangement with the defendant. He expresses his own contentment with that, but proposes to take the claim ufor the $3806 balance” and make an arrangement with “ the parties,” so as to have their claims contained, in the amount the defendant had discharged. He further therein expresses his desire to see the defendant if disposed to make the transfer on those terms, on that day, as 11 the parties wished to leave ” that night, but begs to be considered as not soliciting the transfer. One of those parties was the witness Gilmore. The plaintiff drew the assignment ; it was executed at his office the next day after such letter was sent. Nothing was said in such letter of any previous negotiation. No inquiry was made as to Stewart’s responsibility. The plaintiff made an unconditional offer and it was accepted and carried out next day, probably as early as possible, in order to allow the holders of claims against the defendant to leave. Any representations made by the latter, which induced the plaintiff to adhere to his offer, if he was desirous of withdrawing it, must have been *20 made between writing that letter and receiving the assignment, but there is no proof of any. The only one distinctly testified to, is that made by the defendant when he laid ■ down the pen after signing it. The idea of a negotiation lasting several days is thus dispelled. "Whatever impression the plaintiff had of Stewart’s responsibility derived from representations of the defendant in regard to it, was undoubtedly derived from statements made before the first arrangement, to prosecute on joint account. It is very true, that if they tended to deceive the plaintiff, the defendant was bound, if he knew he was laboring under a false impression therefrom, to undeceive him when he proposed to sell to him. But he did not. The offer came from the plaintiff undoubtedly relying on his previous impression, but not on any derived from new representations. The prophetic statement that “ if he got judgment he would get his money ” is not a representation of an existing fact, and the evidence does not warrant the referee’s finding that during any negotiation for the sale the defendant represented that Stewart was abundantly able to satisfy any claini against him. Both the allegations in the complaint, and findings in the report, either that the defendant made the representation to the plaintiff therein set forth, when he proposed to sell his claim to him, or that he ever proposed to sell it to him, are thus not only unproved, but disproved. And if the case turned upon that, it would render the judgment erroneous.
There is also no allegation in the complaint, nor is it found by the referee, in his report, that the defendant made any of the misrepresentations therein stated for any particular purpose. A general charge of making them fraudulently was inserted in the complaint on the trial before the referee, where no opportunity was offered of compelling the plaintiff to make his complaint more definite and certain and point out the particular purpose intended to be answered by such deceit. In this case, the only deceit which could be inferred to have been intended to be practiced by the *21 defendant, in making any of the representations proved, if made by him fraudulently, must have been to induce the plaintiff to engage to prosecute the claim on shares. But if he afterwards made a new agreement with the plaintiff knowing that the latter was still laboring under the deception practiced, the fraud would have consisted principally in not undeceiving him. And it may be well doubted whether the effect of such representations, even if false and fraudulent, made Without reference to any purchase, could render the latter void.
The case, however, was-relieved from any embarrassment arising from the findings of the referee by the plaintiff’s counsel in the course of argument adopted by him. He claimed the responsibility of the defendant as resting upon his false representation of a fact which he professed to know; and his obtaining value on the faith of its being true. There is, however, not a particle of evidence in the case, that the defendant professed that he knew, what he asserted to be a fact, to be so, unless its mere assertion is equivalent thereto. There is a vast difference, however, between the two. If a man asserts a fact not necessarily within his own knowledge, he simply avers that he knows facts sufficient to induce any one of ordinary understanding to believe that it is so. When he asserts that he knows it, he means to say that the occurrence or existence of that fact has been made known to his senses, and it excludes all inferences from mere hearsay or circumstantial evidence of it. When any one dealing in an article undertakes to say what he knows respecting it, he is bound to disclose exactly what he knows, or becomes responsible, if what he states is not true. But that is upon the ground of presumed fraud. The defendant is, however, hot liable, upon any such ground.'
The present action is for damages for a fraudulent representation, to which the plaintiff changed it, by his amendment before the referee; he cannot, therefore, recover for the mere falsity of the statement alone. The motion to *22 dismiss the complaint on the trial was based upon the want of proof of any fraud. Mere falsity without fraud, forms no ground of recovery. (Hubbard v. Briggs, 31 N. Y. Rep. 518, 530. Young v. Covell, 8 John. 24. Wakeman v. Dalley, 44 Barb. 498. Binnard v. Spring, 42 id. 470. Russell v. Clark’s Ex’rs, 7 Cranch, 69. Tryon v. Whitmarsh, 1 Metc. 1. Stone v. Denny, 4 id. 151.) The language used in some cases, such as Mead v. Bunn, (32 N. Y. Rep. 275;) Bennett v. Judson, (21 id. 238;) Sharp v. Mayor of New York, &c. (40 Barb. 256;) Craig v. Ward, (36 id. 377;) Yates v. Alden, (41 id. 172,) and Galoupeau v. Ketchum, (3 E. D. Smith, 175,) where all allusion to fraud is omitted, must be understood as being merely directed against other objections, because fraud was established in all such cases, and its absence was not made an objection.
The representations too, on whose falsity the plaintiff relies, were evidently of that general kind, which consists of extolling the character of articles a vendor has to sell, as in this case, that the person against whom the claim existed, that was sold, “ was wealthy, was rich, had a great deal of property,” was “abundantly able to pay all claims” and “ could pay the claim if recovered.” It is what every buyer must expect, and if he desire any more special information he should catechise the seller as to the grounds of his belief, or insist on a guaranty. It is in form an expression of mere opinion, and not a representation for which the vendor should be held responsible. The plaintiff perhaps incautiously relied on the defendant’s means of information as more extensive than it was, or his conclusions being sounder than they were; but there is no evidence to charge the plaintiff' with fraud. The claim was not utterly-worthless; there was a spes recuperandi, however small.
I think the judgment should be reversed, and anew trial had, without costs to either party,- the order of reference to be vacated.