EDWARD G. MASON, Executor, etc. *et al.*

*v.*

GUSTAVUS H. BAUMAN.

1. AGENCY—*sale whether as agent or owner.* Where a person holding a note, secured by mortgage, to be sold by him as agent for his principal at not less than a given sum, took an absolute assignment of the same to himself for the price named, for which he gave his principal credit 'on his books, and afterward sold the same at an advanced price, professing to be acting as agent, and stating to the purchaser that he had just obtained the consent of his principal to make the sale : *Held,* that these facts showed that at the time of the sale, he was still acting as agent, notwithstanding the absolute assignment to him.

2. SAME—*purchase by agent, fraudulent concealment.* Where an agent holding a note and mortgage for sale was offered $4,800 therefor, afterward purchased the same of his principal for $4,500, without disclosing the offer he had : *Held,* that if the agent at the time of his purchase failed to disclose important facts to his principal, he failed to acquire a complete title, and was bound to account to his principal for whatever sum he realized out of the sale of the note and mortgage.

3. SAME—*agent's liability to principal.* Where the owner of a note, secured by mortgage, placed the same in the hands of a creditor, properly indorsed, to be sold in the market to raise money for the owner's benefit, and finally assigned the same absolutely for $4,500, for which the agent gave him credit on his books, but shortly afterward, professing to act on behalf of his principal, sold the securities for $5,000 : *Held,* that he was bound to account to his principal for the full amount received by him.

4. SAME—*agents' fraud.* While it is true that the principal is bound by the fraudulent acts of his agent perpetrated on third persons while acting under his authority in reference to the subject of his agency, yet a person dealing with the agent is not liable to the principal for the acts of the agent in fraud of the rights of the principal, when such person is not himself a party to the fraud.

5. SALE BY AGENT—*effect of agents' fraud on title of purchaser.* Where an agent under a valid power sells and indorses negotiable paper in fraud of the rights of his principal, to *bona fide* purchasers, for a valuable consideration paid without notice that the agent is acting fraudulently toward his principal, and there is nothing on the face of the papers, or circumstances of the case, to put them upon inquiry, the purchasers will acquire a title free from all equities existing between the principal and agent.

6. SALE—*notice of equities.* Where the owner of commercial paper in-

dorsed the same to an agent, in form absolute, to enable him to sell the same in the market, and the paper was fair on its face, not yet due, and nothing to excite suspicion or put the purchasers on inquiry, it was held that the purchasers who paid value therefor, would not be held chargeable with notice that the agent was acting fraudulently merely because the purchasers knew that the seller was acting as agent, or because one of them was a relative of the agent.

7. SAME—*fraud as affecting agent's power.* Where an agent, in selling negotiable paper for his principal, acted within the scope of his authority, his subsequent fraud in retaining part of the proceeds of the sale from the principal, will not affect the title of the purchaser who buys in good faith.

8. FRAUD—TRUST—*title when purged from.* Where an agent sold a note, secured by mortgage, under an authority from his principal, to a *bona fide* purchaser for a fair price, who took without notice of any equities between the agent and the principal, and who foreclosed the mortgage and acquired title to the mortgaged premises: *Held,* that such purchaser acquired a title free from all the equities existing between the principal and agent; and that the agent, some years afterward, having purchased the same, could hold the same, and that a decree allowing the principal to redeem from the sale was erroneous.

9. SAME. But had the agent fraudulently sold the securities with a view of acquiring title in himself, and employed the purchaser as an instrument to accomplish such purpose, and thereby acquired title to the mortgaged premises, then the fraud, notwithstanding the power of sale, would have followed the property, both in the hands of the purchaser and his own, and his principal would have had a right to redeem.

10. SAME. The owner of a note and mortgage of $7,500, being embarrassed, indorsed the same to B, a creditor, to sell for the purpose of raising money to meet his liabilities, with directions not to sell for less than $4,500. B, afterward, as the agent, sold the same to *bona fide* purchasers for $5,000, B having no interest whatever in the purchase. B only accounted for $4,500, and some interest. The purchasers foreclosed and acquired thereby the title to the mortgaged premises; and about five years and a half after their purchase, sold and conveyed the premises to B for $7,000. The owner then filed his bill praying to be allowed to redeem, by paying B the amount received from him, with interest, on the ground of fraud on the part of B, which was so decreed. *Held,* that the decree was erroneous in allowing a redemption; but if B had failed to pay over all he received for the note and mortgage, a decree for the unpaid balance in his hands, with interest, would be proper.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

The opinion sufficiently states the case.

Messrs. WAITE & CLARKE, for the appellants.

Messrs. ROSENTHAL & PENCE, and Mr. D. P. JONES, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was a bill in chancery, filed by appellee in the Superior Court of Chicago, against the executor, heirs, and legatees of Charles R. Starkweather, deceased, to the November term 1867. The object of the bill was to obtain leave to redeem lots 5 and 6 in block 1, in Johnson, Roberts and Storr's addition to Chicago. It is not contested that appellee, in 1858, was so far indebted to different persons as to be greatly embarrassed in his pecuniary affairs, and was at that time a tenant of Starkweather, and was indebted to him in a sum of from $1,500 to $1,800 on account of rent.

They entered into an arrangement by which Starkweather was to aid appellee in paying his debts, and to enable him to do so, and as security for the rent due and to become due, appellee transferred to him a mortgage held on one Egerman on the lots in controversy, to secure the payment of $7,500, due in eight years from its date. Also, as a part of the same transaction, appellee executed a deed of trust to one Kinsella, for the use of Starkweather, on some lands in Du Page County, and assigned a certificate of purchase given by the sheriff, of a house which had been sold on execution. These assignments and transfers were absolute in form, but were subject to a defeasance which required them or such portions of them to be returned as should remain after paying appellee's debts. The claim is, whatever may have been its purpose, that this arrangement was made to secure Starkweather his debt for rent, and to enable him to raise money to free appellee from his embarrassment. Appellee also gave Starkweather a chattel mortgage.

During the year ensuing this transaction Starkweather sold a portion of appellee's property and paid a part of his debts.

In September, 1859, appellee wrote Starkweather, urging him to sell the Egerman mortgage at a price not less than $4,500. He had previously held it at a higher price, but he yielded to the pressure which prevented its sale at the sum he previously asked. On the 3d day of November, 1859, appellee made an absolute assignment of the Egerman mortgage to Starkweather for $4,500, as is stated in the assignment; and under that date Starkweather gave appellee credit on his books for that sum for the mortgage, and $325 on account of interest on the mortgage. At the same time he gave Starkweather a receipt for the sheriff's certificate of purchase of the house. Afterward, on the 22d of the same month, Starkweather transferred the mortgage on Egerman to W. B. Hale, who purchased for himself, S. M. Smith, and H. K. Starkweather, of Massachusetts, and received from them the sum of $5,000 therefor. Starkweather indorsed the note to Hale without recourse.

These persons all swear that they were *bona fide* purchasers of the mortgage for its value, and without any notice of the claim of appellee or any other person to the mortgage or note. They further swear that Charles R. Starkweather, after they purchased, had no interest in the mortgage, either directly or indirectly, and neither received interest or rents for himself until they again sold the premises to him after the foreclosure of the mortgage and their purchase under the foreclosure sale. Egerman having made default in payment, the assignees of Charles R. Starkweather, in October, 1862, filed their bill to foreclose the mortgage, and only made Egerman a party defendant. The bill was taken as confessed; a reference was made to the master, who reported there was $8,173.75 due on the mortgage; and on the 23d of January, 1863, a final decree was rendered, ordering the payment of the money, or, on a default, that the premises be sold. On the 28th of June, 1863, complainants in that suit became the purchasers at a sale of the property under the decree. The time for a redemption having expired on the 10th of April, 1865, they conveyed the premises to C. R.

Starkweather for $7,000. He subsequently expended about $1,000 in changing the grade, so as to render the house more accessible.

It is claimed that Starkweather was but a trustee, and that the second assignment, bearing date November 3d, 1859, did not change that relation; that those who purchased of him had notice that he was a trustee, and that they were dealing with a trust fund, when they took the assignment of the note and mortgage; and that when Starkweather afterward purchased the property of them, he acquired it burdened with the trust; it is also insisted that, at the time Starkweather received the last assignment, he then had an offer of $4,800, which he fraudulently concealed from appellee; and on these grounds appellee claims the right to redeem from Starkweather, as the mortgagee of the premises.

It is manifest that Starkweather was the agent of appellee for the sale of this note and mortgage up to the 3d day of November, 1859, when the last assignment was made by appellee to him; and if, from their relations, he failed to disclose all facts important to be known by appellee, he then failed to acquire a complete title to the note and mortgage, and he still remained an agent. That transaction, even if it were conceded that he practiced a fraud on appellee, did not divest him of power still to make a sale and to transfer the whole title to the purchaser, if the latter acted in good faith and paid value for the note and mortgage. Appellee did not then or at any subsequent time do any act manifesting an intention to withdraw the power to sell; and on the 22d of November, when Starkweather assigned the securities to Hale, there was ample power to pass all of the title, whether legal or equitable, whether held by Starkweather or appellee, in the purchaser without notice who paid value. And Hale and his associates in the purchase swear unqualifiedly that they purchased without notice and paid $5,000; and that Starkweather held no interest, either directly or indirectly, in these instruments, from the time they purchased them until they sold him the lots—some five years and a half afterward; and we find no witness who in anywise contradicts the statements of these witnesses.

It is, however, urged that they knew that Starkweather was appellee's agent, as he professed in his letters before and after the assignment of the 3d day of November, 1859, to be selling for another person, and not as the owner. We are unable to comprehend how that fact could charge them with notice that Starkweather was acting fraudulently toward his principal. A man is always bound by the fraudulent acts of his own agent perpetrated on a third person, whilst acting under his authority in reference to the subject of his agency; but we are aware of no rule or any adjudged case which holds that a person can ever be bound by the fraudulent acts of another man's agent. And why should they? They do not appoint the agent; they confer upon him no authority, and do no act that should in morals or in law render them liable for the acts of another man's agent upon whom they conferred no power. When Starkweather offered, as the agent of appellee, to sell them these securities, all they were required to do was to see that he had authority to sell and transfer the title to them, and this they found in appellee's assignment of the 3d of November. Without notice they were not required to look further and learn the relations that existed between the principal and agent. Here was commercial paper, fair on its face, regularly assigned, not due, and negotiable, offered by an agent for sale, and they purchase, without seeing on the papers any thing to excite suspicion, nor does the evidence disclose any thing to have put them on inquiry. Why, it may be asked, did they not acquire a title to this negotiable paper free from all equities that may have existed between the principal and agent? No reason has been suggested, nor does any occur to us, unless they were chargeable with notice; and we find no evidence to charge them.

If any trust relation existed between Starkweather and appellee, beyond a mere agency, where is the evidence that the assignees of this note and mortgage knew of the fact, or where are the facts to put them on inquiry? We fail to find them in this record. The note not being due, the statute authorized them to purchase it, without notice of a defense, and to enforce its payment. Having done so we are not inclined to charge

them upon mere conjecture, or that they might have known, because some of them were relatives of Starkweather.

But if Starkweather was guilty of a fraud, in what did it consist? It can not be said that he used any fraudulent means to induce appellee to sell these securities. Appellee had not only in the first instance given such authority, but we see from his letters that he was urging him to make a sale, as he declared he was unable to hold them. If Starkweather, when he sold, was but the agent of appellee, and he seems to have been, as he says in his letter of the 7th of November that he had that day procured the consent of the owner of these securities that he might sell, then he was bound to pay to him the full amount he received for them. And if he retained any portion of that sum without appellee's consent, it was a fraud on appellee, authorizing him to sue and recover any balance which he had failed to pay to him. And that Starkweather was still merely an agent when he made the sale seems to be true, or why say, on the 7th of November, when he wrote, that he had then procured the consent, when he had received the assignment on the 3d, four days previously? We can see no reason why he should misrepresent, as to the time, as he could, no doubt, have just as readily induced the purchaser, to whom he was writing, to take these securities by saying that he had four days before that time purchased the note and mortgage, as by representing that he was selling for another. We must presume, then, notwithstanding the assignment, that he was acting as agent, and not as owner, in selling them.

For the want of perfect good faith in disclosing the fact that he received $5,000 on the sale of these instruments, he was guilty of a fraud, not in selling, but in retaining a portion of the purchase money. The power to sell being ample and being legally exercised, the purchasers took the title free from all charge of fraud. It vested in them, we have seen, free and untainted with fraud and unburdened with equities of any kind. And when the purchasers converted these securities into real estate, by foreclosing the mortgage and acquiring the title to the mortgaged premises, they held them in like manner.

And the property was in the market of the world, and could be purchased and held by any person who might choose. And as the securities had been extinguished and real estate procured with them, Starkweather might purchase and hold the land, precisely as he could had the money been collected and invested in other real estate. For his fraud he was liable to account for the unpaid portion of the purchase money he received. Appellee had no right to pursue either the note and mortgage or the land, as his only remedy was an action against his agent, the sale being in pursuance to a power well and lawfully exercised. There was no lien attached to the securities, and none could attach to the lots in controversy. Had Starkweather fraudulently sold these securities to the purchasers with a view of acquiring title to these instruments, and had he employed these purchasers as instruments to accomplish that purpose, or ultimately to acquire title to these lots, then the fraud, notwithstanding the power of sale, would have attached to and followed the property both in the hands of the fraudulent purchasers, and his own when he subsequently acquired the title, and that would have given appellee a right to redeem. But the evidence fails to show that such was the purpose, but, on the contrary, it is rebutted. Here was no perversion of a trust fund, as the trust, if one existed, was fairly executed according to the desire of the *cestui que trust,* and there is no ground for pursuing the property as being charged with a trust.

The court below erred in authorizing a redemption; but if Starkweather failed to pay over to appellee any portion of the money received on the sale of the note and mortgage, then appellee should have a decree for that amount, with interest. The decree of the court below is reversed and the cause remanded.

*Decree reversed.*


Mr. JUSTICE BREESE, dissenting:

I do not concur in this opinion. I am satisfied, from all the testimony in the cause, that the transaction between Bauman and Starkweather was a mortgage only—the transfer of the

Egerman mortgage of seven thousand five hundred dollars, was intended merely as a security for the indebtedness of Bauman to Starkweather. This indebtedness is not proved to have exceeded one thousand eight hundred or one thousand nine hundred dollars for rent, and some indefinite amount for money loaned, whether five dollars or five hundred dollars, is not shown. It is not shown that Starkweather delivered up to Bauman any securities he held against him, which Starkweather would have done had Bauman sold the Egerman mortgage to him.

It is clear to my mind, the relation between Starkweather and Bauman, as to this property, was that of mortgagor and mortgagee, and as Bauman has never been foreclosed, his right to redeem exists in full force.

I therefore am of opinion the decree should be affirmed.

THORNTON, J. I do not concur in the opinion of the majority of the Court.