# GEORGE R. H. HUGHES

*v.*

# RICHARD B. WASHINGTON *et al.*

1. WILLS—*power of executor to sell property.* Under a will author-izing the executor to sell property in such manner, and on such terms, and for such prices, as to him may seem best for the interest of the child-ren of the testator, and to reinvest the proceeds arising from such sale in such other property as he may think best for the testator's children, the executor has an absolute discretionary power of sale, as a trustee, in the same manner as he would have held the title if it had been specifically devised to him.

2. SAME—*power of executor to make contracts in relation to real estate of testator.* A party living in Virginia owned real estate in Illinois, and a judgment was rendered against him in the circuit court of the United States, for the Northern District of Illinois, in 1860, from which he took an appeal to the Supreme Court of the United States. There were also deeds of trust on his property in Illinois. In 1861 he was killed in the confederate army, having made a will, containing this clause: "I consti-tute and appoint my brother, R. B. Washington, Wm. T. Alexander, and E. C. Turner, executors of this my last will and testament; and I hereby empower them, or the survivor or survivors of them, to sell any property of which I may die possessed, and which is beyond the limits of Virginia; in such manner, and on such terms and for such price, as to them or him may seem best for the interest of my children, and to reinvest the proceeds arising from such sale in such other property as they may think best for my children." The executor resided in Richmond, Virginia, and had no means to provide for prosecuting the appeal in the Supreme Court of the United States, except the property in Illinois: *Held,* that the executors were authorized, under the will and the peculiar circumstances of the case, to make a contract to give to an attorney an interest in the real estate in Illinois, in consideration of his attending to and protecting the interest of the estate in relation thereto, and also attending to the cause in the Supreme Court of the United States, and that such a contract, if fairly made, should be enforced.

3. PRINCIPAL AND AGENT—*agent must not act adversely to the interest of his principal.* An agent for the owner of real estate has no right to speculate in property committed to his care, nor has he any right to put himself in a position adverse to the interest of his principal.

4. SAME—*agent can not be a purchaser for his own benefit in a sale made by him for his principal.* So, where an agent for the owner of real estate conducted a negotiation for the sale of the same on behalf of the owner

on the one hand, and was really, on the other hand, purchasing for himself, jointly, with the ostensible purchaser, although the transaction purported to be entirely between the owner and such ostensible purchaser, it was *held*, that the transaction was a constructive fraud upon the owner, and that the purchase thus made could not be sustained.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, and Mr. ROBERT RAE, for the appellants.

Mr. B. D. MAGRUDER, and Mr. GEO. F. BAILEY, for the appellees.*

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in chancery, filed in the circuit court of Cook county, by Richard B. Washington, executor, and the heirs at law of John A. Washington, against Geo. R. H. Hughes and others, to set aside certain deeds, and a contract and a settlement, and to vest the title to certain lands in Cook county in complainants.

The cause was heard on bill, answer, replication and proofs, and a decree was rendered for complainants, substantially as prayed for in the bill. Hughes brings the case here by appeal, the other defendants having compromised with the complainants since the rendition of the decree.

This cause, and another between the same parties, have been considered together as one case, the same evidence having been introduced in each, and one argument having been made in both. This opinion is intended for both cases.

In 1859 John A. Washington, of Virginia, purchased certain real estate in Cook county, consisting of four tracts, and

---

* NOTE BY THE REPORTER: This case, as reported on the former appeal, in 65 Ill. 246, does injustice to counsel, in misrepresenting their positions. Mr. MAGRUDER and Mr. BAILEY were counsel for the *appellees* on the first appeal, as in this, and Mr. WM. L. MITCHELL was, alone, counsel for the appellants.

designated, in this case, as the Kingsbury tract, the Webster tract, the ten acre tract, and the undivided half of sec. 21. The litigation in this case has grown out of the connection of Hughes with these lands since the purchase.

In November, 1860, one Ogden recovered a judgment in the United States Circuit Court for the Northern District of Illinois, of $36,481, against John A. Washington and Wm. F. Turner, for an installment due upon a land purchase made by Washington and Turner of Ogden. An appeal was taken from this judgment to the Supreme Court of the United States. Hughes had been engaged in the circuit court as one of the attorneys of Washington and Turner. In September, 1861, Washington, who was then a colonel in the confederate army, was killed. In July, 1861, Washington had given Hughes a power of attorney to sell the Cook county lands, and it seems, from the evidence, that, owing to the then troubled condition of the country, he was exceedingly anxious to make sale of his Cook county lands, even at a heavy sacrifice.

The Kingsbury tract was incumbered by a deed of trust for $10,000, due Bishop O'Regan, due Sept. 21, 1862, with ten per cent interest. The undivided half of sec. 21 was also incumbered by a trust deed, to John V. LeMoyne, for $4500, with ten per cent interest, which became due on the 24th of February, 1864. The other tracts were clear.

At the time Washington died, there was no communication between Richmond, his residence, and Chicago, and Hughes had already advanced some $600 for the purpose of paying interest on the mortgage upon the half section of land. Taxes on the lands were maturing. The appeal taken by Washington and Turner to the Supreme Court of the United States was pending, and Hughes, Washington's agent, had in his hands no means to pay taxes or the expense of the suit, which it was important to have prosecuted to a successful termination. Under these circumstances Hughes started for Richmond, for the purpose of effecting some arrangement with the

executor of the estate of Col. Washington in regard to the Cook county lands and the pending suit.

Upon reaching Richmond, Hughes had an interview with Richard Washington, sole executor of the estate of John A. Washington, deceased, and with Wm. F. Turner, the result of which was, a written contract was made between Hughes and the executor, that Hughes should, at his own costs and expense, prosecute the suit pending in the Supreme Court, Turner and the estate to be at no expense whatever, either for costs, attorney fees or otherwise. And in case the judgment should be affirmed, then Hughes was to receive nothing; but in case the judgment should be reversed, and the estate and Turner released from the same, then Hughes was to have one-third of the proceeds of the Cook county lands belonging to the estate of Col. Washington, after the payment of the incumbrances, or one-third of the lands, as he might elect. Turner also owned certain lands in Cook county, and he, on his part, agreed with Hughes to convey one-third thereof, on like terms as did the executor, in the event that he was released of the judgment.

At the same time, another contract was made between the executor and Hughes, by which Hughes was to take charge of and manage the real estate in Cook county. He was to sell so much of the incumbered property as was necessary to discharge the incumbrances. He was to pay taxes, and take a general management and control of the property. For his services in this respect, Hughes was to have one-fourth of the proceeds of the sales of the incumbered property, after deducting first the claims that were upon it. In case he advanced money to pay taxes or discharge incumbrances, this was to be refunded out of the proceeds of sales, with ten per cent interest.

After the execution of these agreements, Hughes returned to Chicago, and employed two eminent attorneys, one in Chicago and the other in Washington, to argue the Ogden case in the Supreme Court. The cause was heard, and a decision

rendered reversing the judgment, and relieving entirely the Washington estate and Turner from the payment, not only of the judgment but of other large sums thereafter to become due on the contract upon which the judgment had been rendered.

On the trial of the cause, the circuit court decreed that Hughes was not entitled to one-third of the lands or one-third of the proceeds thereof, and decreed he should have only $7603.92 for his services and money by him advanced in defending against the Ogden judgment. This was done on the ground that the executor had no power to make the contract. This brings us to a consideration of the powers of the executor under the will of John A. Washington, deceased.

The fourth clause of the will is as follows: "I constitute and appoint my brother, R. B. Washington, Wm. T. Alexander and E. C. Turner, executors of this my last will and testament; and I hereby empower them, or the survivors or survivor of them, to sell any property of which I may die possessed and which is beyond the limits of Virginia, in such manner, and on such terms, and for such price, as to them or him may seem best for the interest of my children, and to reinvest the proceeds arising from such sale in such other property as they may think best for my children. And I hereby request the court before which they may qualify, not to require from them any security on their executors' bond."

The question is not, whether, in view of subsequent events, it would have been better, financially, for the Washington estate had the executor contracted with Hughes to pay him a definite sum of money for defending against the Ogden judgment, but the point involved is, had the executor, under the will, the power to make the contract? If the executor had the authority, and no undue influence or fraud was practiced by Hughes in obtaining the contract, then it is clearly the duty of courts to enforce the contract according to its terms, regardless of the fact whether it was profitable or unprofitable for the estate.

There can be no question but it was the duty of the executor to defend the estate against the Ogden suit.   The defense could not be made except by employing counsel.   It is conceded by the counsel for appellees, that the executor had power to employ counsel, and bind the estate to pay a definite sum of money for services rendered.   It is also a conceded fact, that the executor had the power, under the will, to sell the Cook county lands.   The executor had no money with which to defend the suit, except confederate money, and that could not be sent North, and had it been sent through the lines, it would have been worthless.   He was, practically, compelled to rely upon the Cook county lands as a means from which to raise the necessary funds to defend against the Ogden judgment.

If the executor had sold a definite piece of the Cook county lands, and obtained money, and used it in the defense of the suit, appellees would not have complained.   In lieu of this, the executor contracted to give Hughes one-third of the lands for his services, if successful, and he was to employ and pay counsel, pay costs, and all other expenses.   Practically it could make no difference whether the executor sold a portion of the lands to a stranger, and used the money to defend against the suit, or gave directly a part to the one employed to defend.

We do not deem it material to determine, under the facts in this case, whether, under the will, the fee of the Cook county lands was vested in the executor, or whether the power of the executor was a naked one, or one coupled with an interest.   Upon these questions many nice distinctions are laid down in the books.

The executor had, under the will, an absolute discretionary power of sale of those lands.   He held this power as a trustee in the same manner as he would have held the title if it had been specifically devised to him.

It was the undoubted duty of the executor to preserve the estate.   The will gave him full powers of sale, and clothed

him with a trust; and his position was, substantially, the same as it would have been had the will, in terms, placed the legal title in him. He was empowered to sell in such manner, on such terms, and for such price, as to him might seem best for the interest of the children of the testator, and to reinvest the proceeds in such other property as he might think best for the children.

In Perry on Trusts, sec. 476, it is said : "There are circumstances where a trustee must exercise the discretionary power of an absolute owner, otherwise great loss might happen to the estate. The exigencies of the moment may demand immediate action. The *cestuis que trust* may be numerous and scattered, or under disability, or not in existence, so that their sanction can not be obtained without great inconvenience. The alternative of applying to the court may be attended with considerable or disproportionate expense, and, perhaps, delay, so that the opportunity is gone and lost forever. It is, therefore, evident, that it is for the interest of the *cestuis que trust* that the trustee should have a reasonable discretionary power, to be exercised in emergencies, though no such power is given in the instrument of trust. And so it is a rule of equity, that a trustee may safely do that without the decree of the court, which the court, on a case made, would order and decree him to do."

We do not decide the executor would have been justified in making the contract with Hughes had the discretionary power of sale not existed in the will, although the authority cited goes to that extent; but, regarding the act of the executor, as a trustee, in connection with the discretionary power of sale given by the will, and considering the peculiar circumstances under which the executor was situated, and the perilous condition of the Cook county lands, these things all considered, we are clearly of opinion the executor was not only justified, but it was a duty resting upon him, to make this or some other contract, for the purpose of preserving the estate of the deceased.

It is, however, insisted, this contract is fraudulent in fact. We do not think the proof shows fraud on the part of Hughes in obtaining the contract. The *onus probandi* rests upon the complainants who assert the fraud. As is to be expected, the testimony of Hughes and the executor upon this point is in conflict, but Hughes' version of the transaction is substantially sustained by the evidence of Turner, who is a relative of the Washingtons. By his testimony, it appears the contract was freely entered into by the executor, after mature deliberation, and upon the counsel and advice of eminent attorneys in Richmond: Juda P. Benjamin, the confederate secretary of war, and Robert E. Scott.

Another strong fact to repel any presumption of fraud is, that Turner, who was a party to the judgment with John A. Washington, made a similar contract with Hughes, and, after the war was over, expressed himself entirely satisfied with the contract and the action of Hughes under it, and conveyed to Hughes one-third of the lands he agreed to convey for Hughes' services in defending against the Ogden judgment. Turner and the executor entered into their respective contracts with Hughes under precisely the same circumstances, and upon the same representations on the part of Hughes; and it is very strange that, if fraud was practiced upon the executor and Turner, the latter was unable to discover it, or even utter a word of complaint.

Under the facts in this case, we are, therefore, clearly of opinion the court erred in disregarding this contract, upon either of the grounds relied upon by appellees.

The next question presented by this record is, can Hughes hold the title to one-half of the Webster tract, obtained by deed from the executor to Roberts, and from Roberts to Hughes?

It appears, from the record, that in July, 1862, the executor gave Hughes a power of attorney, authorizing him to lease, manage, sell and dispose of the Cook county lands. In August, 1862, Hughes sold the Kingsbury tract to one Rob-

erts, a cousin of his, for $20,250. He did not, however, convey under the power of attorney, but had the land sold on a trust deed, which had been given by John A. Washington, in his lifetime, to secure some $10,000. On the 26th day of January, 1863, this same Roberts submitted to Hughes a written proposition to purchase the Webster tract, as follows :

"CHICAGO, *Jan.* 26, 1863.

"G. R. H. HUGHES, ESQ.

"*Dear Sir*—I have made up my mind to offer you for the tract of land on the South Branch of the Chicago river, shown me some days ago, known on the city and county map as lots of J. D. Webster, and containing seventy-one and a half acres, $18,000, in terms as follows : cash, on delivery of a good and sufficient title, $6000 ; in six months, $6000 ; in twelve months, $6000—interest at six per cent on the deferred payments. This offer to be accepted in thirty days, or its withdrawal to be at my option. Letters will reach me, addressed as below.          Respectfully,

"S. ROBERTS,

"Cincinnati, O."

On the 23d day of April, 1863, Hughes, then being in Baltimore, submitted, through a special messenger, to the executor, then residing in Charlestown, Va., the proposition of Roberts. He, at the same time, wrote a letter to the executor, in which he stated the Webster tract was in a slough of the river, and would not, for many years, come into market ; that the offer was a good one, and he recommended the sale. A blank deed was also sent for the executor to execute, conveying the property to Roberts. The executor executed the deed, and sent it to Hughes.

The contract between Roberts and Hughes was not, however, at that time, closed. The land was increasing in value, and in the meantime an offer of $20,000 was submitted to Hughes for the land. In August, 1863, he wrote Roberts that he must see him personally—that their business could not be closed by correspondence. Roberts then went to Chi-

cago, and on the 4th of September, 1863, executed a deed to Hughes for an undivided one-half of the tract. No money was paid by Roberts on account of the purchase, or security given. Hughes kept the deed from the executor to Roberts in his own hands until the 26th day of December, 1863, when he received $6000, the cash payment, and delivered the deed, but took no security for the rest of the purchase money. As early as September, 1863, and before Roberts had made any payment and received a deed, Hughes, it seems, on taking a deed for half of the property, agreed, with Roberts, that they would unite in improving and developing the property, and Hughes was to take charge of it, and act for Roberts as well as himself.

These are a few of the many facts appearing in the record that seem to be ample to convince any unbiased mind that, in the sale of the Webster tract to Roberts, Hughes was conducting the sale, on the one hand, for the executor, and on the other was purchasing for himself—in other words, he assumed the position of both seller and purchaser. Ingenuity was used to make it appear that Hughes was buying of Roberts, and that Roberts was alone purchasing of the executor ; but it is apparent the sale to Roberts was for the joint benefit of Roberts and Hughes.

On November 10, 1863, while Hughes was the agent for the Washington estate, and Roberts had not concluded the purchase by making the cash payment, Hughes, no doubt fearing that he would lose the benefit of the deed from Roberts to himself, for one-half of the property, unless Roberts closed up the trade, after offering to let Roberts have $800 of funds that belonged to the estate if he would raise $5200, says : "The most urgent considerations make this advisable, and especially the rapid advances in the prices of that kind of property. I lately heard of some prices which were asked for lots on the North Branch, which were surprising. Every one expects an active movement in real estate during the coming spring, and it is, therefore, most important for you

to follow the terms of the offer you made, and to get the purchase secured to you before any objections, growing out of the rapid rise of property, can be taken."

Hughes had no right to speculate on the property committed to his care. *Zeigler* v. *Hughes*, 55 Ill. 288. Neither had he, as agent of the executor, any right to put himself in a position adverse to the interest of the Washingtons. 1 Parsons on Cont. 74 ; *Cottom* v. *Holliday*, 59 Ill. 179.

The deed that Hughes obtained of Roberts for an undivided one-half of the property, was not placed upon record until after the commencement of this suit, and the executor was entirely ignorant that Hughes had any interest in the land, as purchaser, until 1867.

We are aware of no principle of law upon which this purchase can be sustained. It was clearly a constructive fraud upon the executor and the heirs of John A. Washington. Hughes, however, is entitled to one-third of the land, under the original contract with the executor ; the one-sixth he should be required to convey to the complainants, and account to them for rents received, after deducting taxes paid, and the $3000 which Hughes has paid on the land should be refunded by the complainants, together with six per cent interest from the time it was received by the executor.

As to the Kingsbury tract, the court find it had passed into the hands of Bowers, an innocent purchaser, but decided the contract between Hughes and the executor, under which Hughes was to have one-third of the proceeds of the sale of the lands or one-third of the lands for defending against the Ogden suit, should be set aside, and the only compensation allowed for the defense of the suit was the item of $7603.92 in the account rendered by Hughes to the executor in the settlement of 1865.

This was error. As we have before said, in speaking of the Webster tract, the contract between the executor and Hughes was binding, and Hughes, on sale of the Kingsbury tract, was  .

entitled to one-third of the proceeds, as is, by the contract, provided.

The decrees will be reversed, and the causes remanded for further proceedings consistent with this opinion.

*Decree reversed.*

At the January term, 1875, on petition for rehearing, the following additional opinion was filed :

Per Curiam : The petition for a rehearing has been carefully considered in this case, and we fail to perceive any reason for departing from the conclusions reached in the decision heretofore announced.    The rehearing will, therefore, be denied.

When the case was considered, our attention was not directed to the question of costs. In the petition for a rehearing, appellees have asked that the costs should not all be taxed against them, and, upon consideration of that question, we are satisfied equity requires that the judgment as to costs should be modified.

The circuit court is directed to enter a decree in conformity to the opinion heretofore filed, and render judgment against the appellant for all costs in that court. One-third of the costs in this court will be taxed to appellant, and the remainder to appellees.