(79 N. W. Rep. 875.)

## A. E. CLENDENING *vs.* M. E. HAWK.

Opinion filed May 27, 1899.

### Tenant's Interest in Crops—Construction of Lease.

The title and interest of a tenant in grain produced by him upon land cultivated under a written lease from the owner of the land, which has not been abrogated or suspended, is to be determined by the terms of such lease.

### Acts of Unauthorized Agent.

When such tenant, during the life of the lease, enters into a written contract with a third person, who assumes to act therein as agent for the owner, but is not so in fact, whereby the tenant is to receive a fixed compensation in money, instead of a share of the crop, such contract, not being authorized or ratified by the landlord, does not alter or supersede the original lease.

### Right of Action in Conversion.

To entitle one to maintain an action for the conversion of personal property, he must show that at the time of the alleged conversion he·had possession, or a legal right to the immediate possession, and a general or special ownership in the property converted. Parker v. Bank, 3 N. D. 87, 54 N. W. Rep. 313, followed.

### Second Mortgagee's Measure of Damage.

A second mortgagee may maintain an action against a first mortgagee for the conversion by the latter of personal property included in both mortgages. The measure of recovery in such case is the value of the property converted (not exceeding the amount due upon plaintiff's lien), less the amount due upon the first mortgage. Lovejoy v. Bank, 5 N. D. 623, 67 N. W. Rep. 956, followed.

### Action by Second Against First Mortgagee.

In an action by a second mortgagee against a first mortgagee for the conversion by the latter of property covered by both mortgages, where it appeared that the value of the property converted exceeded the amount due upon the first mortgage lien, *held,* it was error to direct a verdict for the defendant

Appeal from District Court, Cass County; *Pollock,* J.

Action by A. E. Clendening against M. E. Hawk. Judgment for defendant, and plaintiff appeals.

Reversed.

*Benton, Lovell & Bradley,* for appellant.

The Court erred in directing a verdict for defendant. It is only where there is no legal evidence which if believed will establish a fact material to the plaintiff's case that the Court can direct a verdict. *Carver* v. *Plank Road Co.,* 61 Mich. 584. Where evidence is conflicting, or the credibility of witnesses is questioned the case is for the jury. *Houch* v. *Gue,* 46 N. W. Rep. 280; *United States* v. *Tillotson,* 12 Wheat. 181; *Russell* v. *Smith,* 23 S. E. Rep. 5; *Dirimple* v. *Bank,* 65 N. W. Rep. 501; *Chicago, etc. R. Co.* v. *Olney,* 71 Fed. Rep. 95; *Easley* v. *Easley,* 18 B. Mon. 86. If different minds may honestly draw different conclusions from the facts, whether disputed or not, the case should be left to the jury. *Stevens* v. *Pendleton,* 85 Mich. 137, 83 Mich. 342; *Knight* v. *Towles,* 62 N. W. Rep. 964; *Milne* v. *Walker,* 59 Ia. 186; *Smith* v. *Coe,* 55 N. Y. 678; *Overton* v. *Mining Co.,* 131 Ind. 135; *Sinter* v. *Park Nat. Bank,* 53 N. W. Rep. 205. Hawk's pretended lease to himself was unlawful as against public policy. Mechem on Agency, 457-458; Taylor's L'd. & Ten. § 142; *Cundy* v. *Lindsay,* L. R. 3 App. Cas. 465; *Randolph* v. *Elliot,* 34 N. J. L. 184; *Gregory* v. *Wendell,* 40 Mich. 443; *Barnes* v. *Shoemaker,* 112 Ind. 512; *Winchester* v. *Howard,* 97 Mass. 303.

*Tilly & McLeod,* for respondent.

The later and better rule as to the direction of verdicts is that a case should not be left to a jury unless there is evidence which will warrant a verdict in favor of the party producing it. Or that if a different verdict was rendered it would be set aside as contrary to the evidence. 2 Thompson Trials, 2247-2248; *Farmers' Bank* v. *Duvall,* 7 Gill. & J. (Md.) 78; *Davis* v. *Davis,* 7 Har. & J. (Md.) 36; *Cole* v. *Helb,* 7 Gill. & J. (Md.) 41; *Giermaun* v. *Ry Co.,* 42 Minn. 5; *Rich* v. *Rich,* 16 Wend. 663; *Goodrich* v. *Walker,* 1 Johns. Cas. 251; *Rudd* v. *Davis,* 3 Hill 287, 7 Hill 529; *Mc-Donald* v. *Walter,* 40 N. Y. 551; *Dwight* v. *Ins. Co.,* 103 N. Y. 341; *Didge* v. *Gaylord,* 53 Ind. 365; *Peet* v. *Ins. Co.,* 1 S. D. 262; *Matthis* v. *Matthis,* 3 Jones (N. C.) 132; *Sutton* v. *Madre,* 2 Jones (N. C.) 320; *State* v. *Vinson,* 63 N. C. 355; *Holland* v. *Kindregan,* 155 Pa. St. 156; *Patterson* v. *Dushane,* 115 Pa. St. 334; *Howard Exp. Co.* v. *Nile,* 64 Pa. St. 201; *Bagley* v. *Bowe,* 105 N. Y. 171; *Boulger* v. *Rosa,* 119 N. Y. 459; *Jones* v. *Ry. Co.,* 49 Wis. 352; *O'Brien* v. *Ry. Co.,* 66 N. W. Rep. 363; *Larson* v. *Eau Claire,* 65 N. W. Rep. 731.

YOUNG, J. One question only is presented by defendant's appeal in this case, and that relates to the correctness of the order of the trial court in granting plaintiff's motion for a directed verdict at the close of the case. The plaintiff seeks to recover the value of a quantity of grain which he alleges was converted by the defendant on September 15, 1896. The grounds upon which the right of recovery is based are set out at length in the complaint, in two

distinct causes of action. The first alleges his ownership of the grain in question. The second sets up the lien of a chattel mortgage executed by one J. M. Keep, and default therein entitling him to possession. The answer meets the allegations of ownership contained in the first cause of action by an explicit denial, and as to the second cause of action, based upon the chattel mortgage, alleges that Keep, the mortgagor, had no right or interest in this grain which he could mortgage. So far as the facts contained in the record are material to a review of the single question presented here, they are these:

For several years just prior to 1896, the year in which this grain was grown, J. M. Keep had been a tenant of the Maryland Land Company, farming for it upon shares certain lands owned by it in Cass county. Under the terms of his several leases with them, which were made yearly, he retained three-fourths of the grain, and delivered the remaining fourth at the elevator at Buffalo to his lessor. During this time one W. J. Hawk, the husband of defendant, appears to have attended to receiving the grain at Buffalo for the lessor, and also to have attended to certain matters connected with the actual leasing, but to what extent is not clear; neither is it material in this case, for it is shown that the lease under which the grain in controversy was grown was made under the express direction of the lessor. On December 6, 1895, Keep leased the land for the year 1896, by a written lease of that date, identical in terms with that of the preceding years. This lease was duly authorized by the owner of the land, and is the only lease it either authorized or ratified. It does not admit of dispute that Keep acted under this lease up to the time that he had about 100 acres of wheat seeded. Here, however, begins a series of transactions among the creditors of Keep which have supplied the material for this litigation. It appears that Keep was indebted to A. E. Clendening & Co., of which firm plaintiff was a member, upon a promissory note for $275, which was secured by a chattel mortgage upon the crop of 1896 and upon other property; also to the defendant in a large sum, also secured upon this grain and additional property, defendant's security being prior to that held by Clendening & Co. At and after this time Keep entered into separate contracts, and at different times, with plaintiff, who had become the owner of the note of Clendening & Co., and with defendant's husband, whereby, through them, he secured such advances of money, provision, and credit as was necessary for him to produce this crop, and without which it is evident he could not have done so. By these separate arrangements both Clendening and defendant's husband sought, not only to secure themselves for the advances made, but also to further secure Keep's original indebtedness, by obtaining his entire interest in the crops raised for this year. On May 14, 1896, Keep entered into a written contract with defendant's husband, by which he agreed to cultivate the lands in question for that year for the first party named

in the contract, who was denominated therein as "W. J. Hawk, Agent," and to pay all expenses, and to deliver all the grain at the elevator at Buffalo in the name of the first party. This contract was signed, W. J. Hawk, Agent First Party," and "J. M. Keep, Second Party." For such services the first party was to pay to Keep the sum of $4 per acre.

There seems to have been an oral understanding that out of that sum there should be retained the amount of Hawk's advances, as well as defendant's claim. Keep testifies that his cash contract contained certain conditions in reference to plowing which were to be changed before it was to go into effect, that they were not changed, and that he did not give up his original lease, but continued to act thereunder. With this, however, we are not concerned; for this contract is shown to be wholly between Keep and the defendant's husband, and it did not, therefore, abrogate or supersede the lease made by the owners of the land on December 6, 1895, which stands without contradiction in the record as the only lease or contract either authorized or ratified by them for this year, or of which they had any knowledge. It appears that Keep, as well as the plaintiff, when he examined the cash contract, considered it as the contract of the Maryland Land Company. That it was not is clear. This is shown by the testimony of John R. Bond and Samuel A. Reynolds, who had the immediate charge of this land for the owner. Both testified that the lease of December 6, 1895, was the only contract they had for the year 1896; that defendant's husband had no authority to make the later contract. Even Mr. Hawk does not claim that this cash contract, signed by him, "W. J. Hawk, Agent," in any way bound the owners of the land, or that it was a new contract, superseding the lease. On the contrary, he testifies: "I intended to work the land myself. The Maryland Land Company never gave me authority to hire anybody to work the land by the acre for them. No member of the company or owner of the land ever gave me a lease of the land. I had no lease individually for this land, or any permission to work the land myself, except as I received authority from myself as agent for them. I never had any lease or contract, except from myself as agent." This is clearly a contract between Keep and defendant's husband. Whether it was consummated, and what its legal effect as between the parties thereto, it is not necessary for us to discuss; for it is plain that, under any construction, it could not alter or supersede the lease of December 6, 1895, made by the owners of the land. The ownership of the grain in question is to be determined by the contract in force at the time it came into existence. That, as we have seen, is the original lease, which, as between the parties, has not been in any way affected by the subsequent arrangements of those who were not the immediate parties thereto. Under the terms of this lease three-fourths of the grain grown came into existence as the property of Keep, impressed with the lien of such chattel mortgages as he had given; the sur-

plus above the amount required to discharge such liens continuing subject to his right of disposal as owner as he saw fit. On September 10, 1896, Clendening, believing that the cash contract had been authorized by the Maryland Land Company, and that it was its contract, secured a written assignment thereof from Keep, for the purpose of securing the amount then due him, and for advancements which he thereafter made on the strength of holding the assignment. After the crop was threshed and delivered to defendant's elevator in Buffalo, plaintiff made demand upon the Maryland Land Company for payment of the cash sum due Keep for producing the grain under this contract. It then developed that this contract was not only unauthorized by it, but its existence was unknown; further, that defendant's husband had remitted to it the proceeds of its one-fourth of the grain, in accordance with the terms of the original lease, as he had done in previous years. Plaintiff's demand was, of course, refused. Thereafter on January 9, 1897, he obtained from Keep an assignment of all his right and interest in the crop of 1896, including his rights under the original lease.

These statements of facts are sufficient for our present purpose. It will be seen that plaintiff wholly failed to present any evidence to support the allegation of ownership contained in his first cause of action. The assignment of the cash contract—if it were in force, and had been properly authorized—would transfer to him only a right to recover the amount of money due his assignor; and the assignment of the lease was made long after the date of the alleged conversion. Ownership at the time was necessary. This Court, in *Parker* v. *Bank,* 3 N. D. 87, 54 N. W. Rep. 313, said: "It is well settled that no action for conversion can be maintained unless the plaintiff shows a general or special ownership in the property converted, and possession or a legal right to immediate possession at the time of the conversion." As to this cause of action the order of the trial court was correct.

The second cause of action, wherein plaintiff relied upon his chattel mortgage lien, was, we find, improperly withdrawn from the consideration of the jury. The existence of the debt, the mortgage, the identity of the property, and default entitling plaintiff to possession were properly shown. It is true that plaintiff's mortgage is not a first lien, and that the defendant had two prior mortgages on this grain; but it is settled law within this jurisdiction that a second mortgagee may maintain an action for conversion against the first mortgagee for the wrongful conversion of the property covered by the two mortgages, and recover as damages the value of the property converted, up to the amount due on his lien, less the amount due upon the prior liens held by the first mortgagee. *Lovejoy* v. *Bank,* 5 N. D. 623, 67 N. W. Rep. 956. If, in this case, it appeared that the amount of defendant's mortgage liens exceeded the value of the property, then plaintiff would have suffered no damage, and direction of a verdict against him would

have been proper; but, on the contrary, it appears that the value of the grain received by the defendant was largely in excess of the amount of the debt secured by her chattel mortgages. The verdict was, therefore, as to this cause of action, improperly directed.

Defendant's answer contains no allegation under which evidence of the existence of prior incumbrances is admissable in mitigation of damages. This evidence was received at the trial over plaintiff's objection, but upon the Court's order, which appears of record, permitting defendant to amend her answer to conform to the proof. This has not been done, and the case is here upon the original pleading. Should we treat it as amended, however, it would not alter our conclusion. The judgment of the District Court is reversed, and a new trial ordered. All concur.