(85 N. W. Rep. 988.)

---

A. E. CLENDENNING *vs.* M. E. HAWK.

Opinion filed April 26, 1901.

**Agent to Lease Cannot Let to Himself.**

> An agent clothed with authority to lease the lands of his principal is not authorized to lease the same to himself. Such authority extends to leasing to third persons, and a lease attempted to be made to himself, in reliance upon such agency,· is wholly unauthorized, and without force or legal effect as a contract.

**Ratification of Acts of Agent—Rights of Third Parties.**

> The rule that a principal may validate the unauthorized acts of his agent by ratification, so as to make them valid from their inception, is modified by the proviso that such ratification cannot affect the rights of third persons which have intervened prior to such ratification.

Appeal from District Court, Cass County; *Pollock,* J.

Action by A. E. Clendenning against M. E. Hawk. Verdict for defendant, and plaintiff appeals.

Reversed.

*Benton, Lovell & Holt,* for appellant.

*Tilly & McLeod,* for respondent.

YOUNG, J. This is an action to recover damages for the alleged conversion of a quantity of grain upon which plaintiff claims to have had a mortgage. The case has been tried twice in the District Court, and this is the second appeal to this Court. At the first trial a verdict was directed by the Court for the defendant. A motion for new trial was made and overruled. The order overruling the motion was reversed upon appeal to this Court. See *Clendenning v. Hawk,* 8 N. D. 419, 79 N. W. 878. A new trial was had, and a verdict was returned by the jury for the defendant. Plaintiff again moved for a new trial. His motion was denied, and this appeal is from the order denying such motion. The motion is based upon alleged errors of law occurring at the trial, relating both to the

admission of evidence and to the instructions, as well as upon the alleged insufficiency of the evidence. The last ground, namely, the insufficiency of the evidence, is the only one we shall consider, inasmuch as it is entirely decisive in appellant's favor. It is agreed that but a single ultimate fact is involved, and that is the ownership of the grain upon which plaintiff claims to have a mortgage. Plaintiff contends that it is established by undisputed evidence that it was owned by Keep, the maker of the mortgage. The defendant contends that the jury were warranted in finding that it was owned by her husband, W. J. Hawk, and that it was not, therefore, covered by plaintiff's mortgage. This presents the only question in the case. It is conceded that all other elements necessary to a recovery by plaintiff are established by undisputed evidence. Reference, therefore, will only be made to such evidence as bears upon this one question. For a more complete statement of facts, see the opinion in the former appeal.

Plaintiff's chattel mortgage covered three-fourths of the grain to be grown in 1896 upon section 25, in township 140, range 55, in Cass County. The mortgage was given by J. M. Keep, and was duly filed in the office of the register of deeds of Cass County. The land described in said mortgage was owned by Enoch Noyes, Samuel A. Reynolds, and Mrs. J. R. Bond, all of whom were nonresidents. They styled themselves as the "Maryland Land Company." Keep, the mortgagor, was their tenant, and was in possession of said land under a written lease from the owners thereof, which lease gave him the entire and exclusive possession from November 1, 1895, to November 1, 1896. The lease contained none of the special and peculiar provisions by which such instruments are now generally incumbered. It provided that as rent for the premises Keep should deliver at the elevator at Buffalo, N. D., one-fourth of the grain grown thereon. The owners reserved a right to re-enter in case of default in paying such rent. Keep prepared the land for crop, seeded it, harvested and threshed the grain, and delivered one-fourth of it at Buffalo, as provided in the lease above referred to, and in due time it was sold, and the proceeds remitted to the owners of the land. The grain in controversy is the remaining three-fourths. If these were the only facts, it would be readily conceded that Keep owned the grain in question, and that it was covered by the mortgage.

What are the facts upon which the alleged ownership of Hawk is based? They are few. A large amount of evidence was introduced by the defendant for the purpose of showing that her husband, W. J. Hawk, who she alleges was the owner of the grain in question, was the agent of the owners of the land for leasing purposes. This is flatly contradicted by the owners, but, for the purpose of this decision, it may be conceded that he had the power to make leases as claimed. It is upon an alleged exercise of this assumed agency that his alleged ownership of the grain in controversy is

based. But before considering this we will refer to an individual transaction between Hawk and Keep, the legal effect of which appears not to have been clearly understood, either at the former or present trial. It appears that on May 14, 1896, a written contract was entered into between Keep, the tenant, and defendant's husband, with refernce to the crop in question, a portion of which crop was then seeded. This document names "W. J. Hawk, agent," as the first party, and J. M. Keep, as the second party. By its terms Keep agreed "to cultivate and crop, during the year 1896," the land in question; "to do all the work; haul the seed from whatever place the first party shall direct; sow, harvest, and thresh and deliver all of said grain at Buffalo, N. D., in due and proper season, at his own cost and expense, * * * in the name of the first party." Hawk agreed therein to pay to Keep the sum of four dollars per acre for all land cropped. The instrument also contained the following provision: "First party [Hawk] can have power to enter upon the premises and take possession of same and complete this contract himself, or by agent, at any time the second party should fail to do the work in a good and farmlike manner, and in proper season." The subscriptions to the instrument were "W. J. Hawk, Agent of First Party," "J. M. Keep, Second Party." Keep denies that this contract ever became operative, for reasons which we need not now consider. The character of this contract, and its effect upon the lease then existing and in force between Keep and the owners of the land, were considered on the former appeal. We said: "This is clearly a contract between Keep and defendant's husband. Whether it was consummated, and what its legal effect was, as between the parties thereto, it is not necessary for us to discuss; for it is plain that, under any construction, it could not alter or supersede the lease of December 6, 1896, made by the owners of the land. The ownership of the grain in question is to be determined by the contract in force at the time it came into existence. That, as we have seen, is the original lease, which, as between the parties, has not been in any way affected by the subsequent arrangements of those who were not immediate parties thereto." There is no pretense or claim that in making this contract Hawk was acting as agent for the owners of the land, so as to make it their contract, and thus bind them to its terms. On the contrary, its existence was not made known to them until after the grain was in the elevator at Buffalo, when they promptly disclaimed any responsibility therefor. Hawk himself, even, does not claim that he made it for his principals, but expressly declares that he was acting for himself. Neither does he claim that any act has been done by way of ratification to make it the contract of the owners of the land. The instrument thus stands in the record before us just as it did in the former appeal, as an individual transaction between Hawk and Keep in itself without force and virtue to supersede or alter the contract of lease between Keep and the owners of land under which the former was in possession. Not only was this contract ineffective to avoid the lease, but

it was in fact unattended by any change in Keep's relation to the land. He remained in possession and proceeded with his farming operations just as though no such document was in existence. Hawk did not take possession of the land, and by the terms of the instrument was not entitled to enter, until a default had occurred, which it appears never took place. But had Keep let Hawk into possession, apparently it would not have made any difference; for the rule is that "if a tenant permits a third person to occupy the premises, in the absence of any recognition by the landlord, it is equivalent to his personal occupancy, and is followed by the same consequences." *Bacon* v. *Brown,* 9 Conn. 334.

So far the facts are substantially the same as in the former appeal, and our construction is ruled by our former decision. One proposition, however, is now presented which was not then urged or considered. It is that Hawk, by virtue of his agency for the owners of the land for leasing purposes at or about the time he made the cash contract with Keep, leased the land to himself; in other words, that he, as agent for the owners and on their behalf, made a contract with himself individually, whereby for them he transferred to himself the right to possess and use the land in question for the cropping season of 1896. No such pretended lease was disclosed to his principals. Neither does it appear that at any time he has named the duration or terms of such alleged lease to himself, so that it is doubtful whether the mere statement that he leased the land to himself could in any event rise to the dignity of a contract. His statement appears to be his construction of his acts, and is perhaps to be attributed to the exigencies of the complicated situation in which he finds himself, rather than as a declaration that he actually took steps to lease the land to himself. We may assume, however, that so far as he had power, he did lease to himself. The question at once arises, had he such power? Can a person occupy the double positions of agent of one party to a contract, and be himself the other party to it? In other words, can a person be at the same time a vendor and vendee, or lessor and lessee, in the same transaction? The principle is the same in either case, for the agent stands in the place of his principal. Clearly not. The positions are conflicting, incompatible, and impossible. Their interests are adverse, rendering the union of the dual powers impossible in one person. If this were the first time the question had arisen, we should not hesitate for an answer. There is, however, an unbroken line of authorities on the question. The principle is stated in 4 Kent, Comm. 438, as follows: "A person cannot act as agent for another, and become himself the buyer. He cannot be both buyer and seller at the same time, or connect his own interest in his dealings as an agent or trustee for another. It is incompatible with the fiduciary relation. *'Emptor emit quam minimo potest; venditor vendit, quam maximo potest.'* The rule is founded on the danger of imposture, and the presumption of the existence of fraud inaccessible to the eye of the Court. The policy of the rule is to shut the door against

temptation, and which, in the cases in which such relationship exists, is deemed to be, of itself, sufficient to create the disqualification." This Court adopted and applied the rule in *Anderson* v. *Bank*, 5 N. D. 80, 64 N. W. 114, wherein it was held that an agent to sell notes could not sell them to himself, and that such attempted purchase was in itself illegal and void. The rule, and the reasons therefore are well stated by *Rapallo*, J., in *Dutton* v. *Willner*, 52 N. Y. 312, in the following language: "It is a well settled and salutary rule that 'a person who undertakes to act for another in any matter shall not, in the same matter, act for himself.' It is only by a rigid adherence to this simple rule that all temptation can be removed from one acting in a fiduciary capacity to abuse his trust, or seek his own advantage in the position which it affords him. One consequence of a violation of the rule is that the agent must, at the option of his principal, account to him for any profit he may have made by the transaction. It matters not how fair the conduct of the agent may have been in the particular case, nor that the principal would have been no better off if the agent had strictly executed his power, nor that the principal was not in fact injured by the intervention of the agent for his own benefit. If the agent deals with the subject matter of his agency, or, by departing from the instructions of his principal, obtains a better result than could have been obtained by following them, the principal can claim the advantage thus obtained, even though the agent may have contributed his own funds or responsibility in producing the result. The rule which places it beyond the power of the agent to profit by such transactions is founded upon considerations of policy, and is intended not merely to afford a remedy for discovered frauds, but to reach those which may be concealed; and also to prevent them, by removing from agents and trustees all inducements to attempt dealing for their own benefit in matters which they have undertaken for others or to which their agency or trust relates." The following authorities show the firmness with which the principle has been adhered to by the Courts: *Bain* v. *Brown*, 56 N. Y. 285; *Michoud* v. *Girod*, 4 How. 554, 11 L. Ed. 1076; *Iron Co.* v. *Sherman*, 30 Barb, 553; *Moore* v. *Moore*, 5 N. Y. 256; *Gardner* v. *Ogden*, 22 N. Y. 332, 78 Am. Dec. 192; *Clute* v. *Barron*, 2 Mich. 192; *Dwight* v. *Blackmar*, 2 Mich. 330, 57 Am. Dec. 130; *Moore* v. *Mandlebaum*, 8 Mich. 433; *People* v. *Township*, 11 Mich. 222; *Powell* v. *Conant*, 33 Mich. 396; *Copeland* v. *Insurance Co.*, 6 Pick. 198; *Ruckman* v. *Berkholz*, 37 N. J. Law, 437; *White* v. *Ward*, 26 Ark. 445; *Fry* v. *Platt*, 32 Kan. 62, 3 Pac. 781; *Stewart* v. *Mather*, 32 Wis. 344; *Butcher* v. *Krauth*, 14 Bush. 713; *Pratt* v. *Thornton*, 28 Me. 355, 48 Am. Dec. 492; *Malthews* v. *Light*, 32 Me. 305; *Parker* v. *Vose*, 45 Me. 54; *Banks* v. *Judah*, 8 Conn. 145; *Church* v. *Sterling*, 16 Conn. 388; *Sturdevant* v. *Pike*, 1 Ind. 277; *Kerfoot* v. *Hyman*, 52 Ill. 512; *Cottom* v. *Holliday*, 59 Ill. 176; *Mason* v. *Bauman*, 62 Ill. 76; *Hughes* v. *Washington*, 72 Ill. 84; *Tewksbury* v. *Spruance*, 75 Ill. 187; *Francis* v. *Kerker*, 85 Ill. 190; *Shannon* v.

*Marmaduke,* 14 Tex. 217; *Scott* v. *Mann,* 36 Tex. 157; *Mechem,* Ag. §§ 455, 462. See, also, *Davis* v. *Hamlin,* 108 Ill. 39; *Valette* v. *Tedens,* 122 Ill. 607, 14 N. E. 52; *Grumley* v. *Webb,* 44 Mo. 444; *Gower* v. *Andrew,* 59 Cal. 119, 43 Am. Rep. 242.

It is urged, however, that this alleged lease was validated by a subsequent ratification by the owners of the land. It is sufficient, for the purpose of determining this case, to say that no acts of ratification are claimed to have occurred prior to the delivery of the grain to defendant's elevator, at which time plaintiff's mortgage interest had attached. It is an elementary principle that the ratification of an unauthorized act will not operate retrospectively to the prejudice of third persons. This principle will be found declared in § 4318, Rev. Codes, which reads: "No unauthorized act can be made valid retroactively to the prejudice of third persons without their consent." It is entirely clear that the ratification of this unauthorized lease, if it was ratified, could not affect the rights of plaintiff, which rights had become fixed long prior to the time the acts relied upon show ratification occurred. The claim of title in Hawk has, then, no foundation in the evidence or in the law. On the other hand, it appears that the lease by virtue of which Keep possessed and cultivated the land was in no way affected by the transaction to which we have referred. He did not surrender the written lease itself by virtue of which he entered into possession. Neither did he abandon or surrender possession of the land. On the uncontroverted facts, he was, as matter of law, the owner of grain grown on said land. Had plaintiff requested a directed verdict in his favor, it would have been error to have denied such motion. No motion, however, having been made, we are not permitted to direct the entry of the judgment in plaintiff's favor to which he is entitled, but are confined to reversing the order denying the motion for new trial. The District Court will reverse its order, and grant a new trial. All concur.