## Hartford Life Insurance Company v. Nicholas J. Sherman, et al.

### Gen. No. 4,448.

1. INSURANCE POLICY—*when settlement upon, does not bind insured.*
Where a settlement was made by the insured with the agent of the
company under the belief, fraudulently induced by such agent, that
the company had asked an extension of time as to a part of the amount
due under the policy, he may subsequently sue and recover of the com-
pany the unpaid balance, notwithstanding he had accepted the personal
note of such agent.

2. AGENT—*when representations of, bind principal.* Where the acts
of the agent will bind the principal, his representations respecting the
subject-matter made while he is transacting the business and exercis-
ing his authority, will also bind the principal, even though such repre-
sentations are fraudulent and constitute a breach of trust as against the
principal.

3. EVIDENCE—*effect of failure to produce.* Failure to produce ma-
terial testimony apparently in the power of a party and to show ina-
bility to produce it, is liable to create a presumption or inference in
the minds of the jury that the proof is not offered because it would be
unfavorable to the party failing to produce it or to account for its non-
production.

4. RELEASE DEED—*what not.* A mere receipt for the payment of
money is not a release deed.

5. RECEIPT—*may be contradicted by parol.* A receipt, as distin-
guished from a release deed, may, in a court of law, be contradicted
and explained by parol proof.

Action of assumpsit. Appeal from the Circuit Court of Kendall
County; the Hon. CHARLES A. BISHOP, Judge, presiding. Heard in this
court at the April term, 1905. Affirmed. Opinion filed October 25,
1905.

JOHN FITZGERALD and KRAUS, ALSCHULER & HOLDEN, for
appellant.

DARNELL & LAWBAUGH and GEORGE M. POPHAM, for ap-
pellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

This was a suit by Nicholas J. Sherman and Mary A.
Sherman, his wife, against the Hartford Life Insurance

Company, to recover a balance alleged to remain unpaid upon a policy issued by the company to plaintiffs upon the life of their minor son, Ray M. Sherman, who died August 17, 1901, as the result of an accident. By withdrawals the declaration was reduced to an amended first count and the common counts. Defendant filed the general issue and two additional pleas; the first, of payment in full to plaintiffs, and the second, that plaintiffs, by their deed, released the causes of action mentioned in the declaration. To the first special plea, plaintiffs replied denying payment in full, and also replied denying payment except $2141, which sum the replication alleged was in part payment only of the promises mentioned in the declaration. To the second special plea, plaintiff filed joint and several replications of *non est factum*. Plaintiffs also replied to the second special plea that the supposed release in that plea mentioned was obtained from plaintiffs by the fraud of defendant. To this last replication defendant rejoined that said writing of release was obtained from plaintiffs fairly, and not by fraud. These pleadings were followed by two additional special replications to said second special plea, in which the facts relied upon by plaintiffs as fraud committed upon them by Peter Becker, the agent of defendant, in obtaining said supposed release, were set out at great length. The rejoinders to these two additional special replications were general denials. Issues were joined upon these several pleadings, and there was a trial, and a verdict for plaintiffs for $2,089.78. Motions for a new trial and in arrest of judgment were denied. Plaintiffs had judgment on the verdict, and defendant appeals.

A stipulation read in evidence admitted certain facts, and proof of certain other facts was made and not disputed. It was proved without question that plaintiffs were insured by defendant on the life of their son, Ray, for $4,000; that Peter Becker was defendant's agent in entering into such contract of insurance; that Ray died; that Sherman wrote defendant of the death, and defendant sent Sherman blanks for proofs of death, but with a blank for only one attend-

ing physician; that Becker went to plaintiffs and told them it was his business to attend to the proofs of death, wrote defendant that plaintiffs had three doctors, and asked for two more blanks, and asked that the draft for payment be sent to the bank at Somonauk, so that he could pay the claim, as it would help him to get more business; that the company did send the additional blanks to Becker, and he assisted in finishing the proofs of death, and sent them to the defendant; that these proofs were accepted, and that on October 1, 1901, defendant became absolutely liable to pay plaintiffs $4,000 under said policy; that defendant sent to Becker its check on a bank in Hartford, Conn., for $2,000, payable to the order of Mrs. Sherman, and its other check on said bank for $2,000, payable to the order of Sherman, one receipt for $2,000 in full, to be signed by Mrs. Sherman, and another receipt for $2,000 in full, to be signed by Sherman; that with these checks and receipts, defendant sent a letter of directions to Becker, and told him that claims were paid through agents as a favor to them, to enable them to make use of the payments in the solicitation of new business, and therefore he must not charge anyone for expenses in making the settlement; that after Becker began assisting about the proofs of death, and before he made the settlement of the Ray Sherman policy hereinafter referred to, he induced plaintiffs to apply for a policy with defendant on the life of another minor son, Earl Sherman, and that it was then agreed that the first year's premium on this new policy should be taken out of the payment of the policy on the life of Ray Sherman; that defendant issued and delivered to the Shermans a policy on the life of Earl Sherman; that thereafter, on October 14, 1901, Becker visited plaintiffs and made some kind of a settlement with them, in which he delivered to them one draft of that date, drawn by the Somonauk Bank on the First National Bank of Chicago for $1,000 payable to the order of Sherman, and another like draft payable to the order of Mrs. Sherman, and a note, purporting on its face to be the individual note of Becker, for $1,859, payable to the order

of Sherman, four and one-half months after date with interest at five and one-half per cent., and that Becker received some kind of a receipt or receipts for the total sum of $4,000, and carried away from the Sherman home the Ray Sherman policy. The first year's premium of $141 on the Earl Sherman policy was adjusted that day, and treated as paid. That evening Becker deposited in his own account in the Somonauk bank the two checks defendant had sent him for $2,000 each, and each bore upon its back what purported to be the signature of the payee. Defendant paid these two checks of $2,000 each in due course of business. On October 15, 1901, the next day after the transactions just enumerated, Becker mailed defendant a letter enclosing the Ray Sherman policy and the two receipts for $2,000 each which defendant had sent him, and one of these purported to be signed by Mary Sherman and the other by Nicholas J. Sherman. Soon after October 14, 1901, Mrs. Sherman endorsed the draft for $1,000 drawn in her favor by the Somonauk bank, and her husband endorsed the draft for $1,000 drawn in his favor by said bank, both on the First National Bank of Chicago, and these drafts were deposited in other banks, and soon afterwards paid. These two sums of $1,000 each were all the money plaintiffs ever received under the Ray Sherman policy, to which should be added the credit of $141 upon the premium on the Earl Sherman policy. The note of $1,859 was not paid, and some two months or more after it was due, plaintiffs placed the matter in charge of an attorney, and the latter wrote defendant demanding payment of the balance remaining unpaid under the Ray Sherman policy. This was the first knowledge defendant's general officers had that the plaintiffs claimed not to have been paid in full. Defendant sent a special agent to investigate. Defendant did not pay, and plaintiffs brought this suit.

Becker lived at Somonauk, some fourteen miles from the farm and home of Sherman. Between nine and ten o'clock in the morning of October 14, 1901, Becker went into the Somonauk Bank and exhibited to Wright, its cashier,

the two checks of .$2,000 each, issued by defendant, as already described, which checks did not then bear any endorsement upon their backs, and Becker got from that bank $4,000 less said premium of $141—that is, the Somonauk bank delivered to Becker its two drafts for $1,000 each, on the First National Bank of Chicago, already described, and $1,859 in cash. These drafts and cash were delivered to Becker at his request, and he told Wright he was going out to fix up with the Shermans for this policy; that 'he wanted to take these checks out to get their endorsements, and the checks were to be taken by the bank in payment of the money it advanced. Between four and five o'clock in the afternoon of that day, Becker returned to the bank, bringing the two checks for $2,000 each, each bearing the apparent endorsement of its payee, which he then deposited. He also then exhibited to Wright the two receipts for $2,000 each, which defendant had sent to Becker, and one then bore the apparent signature of Sherman and the other of Mrs. Sherman.

The testimony of plaintiffs was to the general effect that Becker arrived at the Sherman house about ten or 10:30 that forenoon; that at his request, Mrs. Sherman sent to the field for Mr. Sherman; that while waiting, Becker paced the floor and seemed in a hurry; that when Sherman came, Becker told him defendant had sent him there to settle the insurance on Ray's life, and they sat down at the table. Becker had a satchel with him. He took it upon his lap and opened it, and appeared to be looking in it for some papers. Becker then told Sherman the company could not pay all they owed at that time; that it could pay only $2,000; that it only sent $2,000 to pay them. Sherman inquired how that was. Becker replied that the Hartford Life Insurance Company was hard up; that they had had heavy losses, and wanted a little time. Becker then produced the two drafts for $1,000 each, already described, and laid them on the table, and presented to Sherman a receipt to be signed. Sherman looked at it, and saw it was a receipt for $4,000, and asked Becker how it was

that the receipt was drawn for $4,000 when he only had paid $2,000. Becker told Sherman not to worry about it; that he would see that the Hartford Life Insurance Company paid it; that it would be all right. He also said that the policy would have to be surrendered and a receipt given before he could do anything about a settlement. Sherman said if he signed the receipt, he must have something to show that the company still owed him, or he asked what he would have to show that the company still owed him. Becker said he would give his note. They talked about the time the deferred payment should run. Sherman said he owed money on his farm, due March 21st following, and so wanted the money in February, in time for that payment, and they fixed on four and one-half months from that date as the time for the payment of the balance. When Becker said he would give his note, Mrs. Sherman asked if that would be all right. Becker replied that it would be just as good a note of the company as if the president of the Hartford Life Insurance Company signed it. Sherman then signed the receipt, Becker laid down the two drafts for $1,000 each, put the policy and the receipt in his satchel, and either shut or was shutting his satchel and was preparing to leave, when Sherman said: "I must have something to show that the company still owes me." Becker then sat down again, and made figures deducting the premium on the Earl Sherman policy from the $2,000 remaining unpaid, and found the balance was $1,859. Sherman produced a blank note from a book he had, and wrote a note for that sum, and Becker signed it and left. Just as Becker left, he said that if they should need the money before it was due, to write and let him know, and he would see that the Hartford Life Insurance Company paid it.

Both Mr. and Mrs. Sherman testified that Sherman signed nothing that day but the receipt for $4,000, and that Mrs. Sherman signed nothing whatever that day. When the purported signature of Mrs. Sherman on the back of defendant's check for $2,000 payable to her order, and her

purported signature to the receipt for $2,000, were presented to her on the witness stand, she denied that those were her signatures. Sherman testified denying the genuineness of his purported signature on the back of defendant's check for $2,000 payable to his order and his purported signature to the receipt for $2,000. Stern, the special agent sent by defendant, testified that in an interview with Mr. and Mrs. Sherman in their attorney's office Sherman admitted that the signature to the $2,000 receipt was his signature, while Sherman and his attorney both testified that Sherman did not then make that statement, but that what he did say was that it looked like his signature, but was not his signature.

If this testimony was true, plaintiffs were entitled to recover. It is true, defendant proved it had given Becker no authority to ask an extension of time of payment, or to bind it by a note, and that it had sent him, with the checks, a letter of instructions which required him to receive the policy and receipts signed before delivering the checks. Yet in all Becker did that day, under the evidence which we are now assuming to be true, he was acting in and about the matter of his agency—in and about the very matter which he was authorized by his principal to transact. Becker had solicited this insurance. The company had issued this policy upon the application Becker had taken. Becker had collected the premium on the Ray Sherman policy. The company had sent Becker the additional blank proofs of death, and had notified the Shermans that they had sent the same to Becker, thereby inviting them to receive such blanks from Becker and to deal with him in that matter. Becker had solicited the policy on the life of Earl Sherman, and the company issued the policy on the application he had so taken, and before he had collected the first premium. He was collecting that premium on the day in question, and it does not appear defendant has questioned the collection of that premium in the way he did collect it. Apparently Becker had granted the Shermans time for the payment of the premium, and the company

had ratified it by delivering the policy before the premium was paid. All the business the Shermans had ever had with defendant had been transacted through Becker as its agent, and his acts had never been repudiated or questioned by the company. The company now owed them $4,000 on their policy, concerning which he was the only agent of defendant known to them.- Becker came professing the company· had sent him to settle with them. He had, in fact, been sent by the company for that purpose. He brought two drafts of $1,000 each. Apparently he was empowered to act for the company. We are of opinion that under such circumstances the Shermans were not required to be suspicious, to question his authority, or to demand and inspect his letter of instructions. A person dealing in good faith with an agent who is apparently acting within the scope of his authority is not responsible for any breach of trust the agent may perpetrate upon his principal. Where one of two innocent contracting parties must suffer from the fraud or unauthorized act of an agent, the loss should fall on him who selected the agent and whom the agent represents. One dealing with an agent is not bound to be on the watch lest the agent wrong his principal. Where the acts of the agent will bind the principal, his representations respecting the subject-matter, made while he is transacting the business and executing his authority, will also bind the principal, even though such representations are fraudulent. Taylor on Private Corporations, sec. 203; Keedy v. Howe, 72 Ill. 136; Mason v. Bauman, 62 Ill. 76; Toledo R. R. Co. v. Harmon, 47 Ill. 298; McBean v. Fox, 1 Ill. App. 177; Sharp v. Mayor, etc., of New York, 40 Barb. 256; 7 Am. & Eng. Ency. of Law, 825, 830, 831.

Sherman was a farmer and had lived on that one farm all his life except one year. He had a mere common school education, acquired in early youth. Mrs. Sherman was of Swiss descent. They could read and write. Their literary opportunities were confined to a weekly newspaper and books obtained from a Sunday School library. The jury were warranted in finding from their direct and cross-

examinations that they were simple-minded and unsuspicious people, not skilled in the ways of the business world. It would be a strange doctrine to hold that if a person whom they knew to be an agent of their insurance company, and the only agent whom they had ever seen or known in connection with their policy, came to them to settle a loss, they must call for and scrutinize his letter of instructions and contract of agency, and watch to see that he did no act outside the authority privately granted him; and that if they failed to take these precautions, then the company, while accepting all he did within his authority, might repudiate all he did outside the exact letter of his instructions. In our judgment, if plaintiffs' proof above recited is true, defendant is bound by all Becker did there that day. The note having been accepted under Becker's false representation that the company was hard pressed for money on account of many losses, and could not pay all at once but needed time, and that a note signed by its agent, Becker, would bind the company as effectually as if signed by the president, and a receipt having been obtained under those circumstances, those instruments, the note signed by Becker and the receipt, would not relieve the company of its obligation to pay the balance due under the policy.

Defendant insists that certain discrepancies developed in the cross-examination of Mr. and Mrs. Sherman stamp their testimony as untrue and unreliable. Some of these criticisms are of some force, and others are of little moment. The jury believed the testimony of Sherman and his wife. We would not be warranted in disturbing that conclusion. Defendant introduced two letters, purporting to be written by Sherman to Becker, about the time he put the case in the hands of an attorney. It is claimed these letters show Sherman then looked to Becker personally for the payment of the note, and that they are in some ways inconsistent with the testimony of the plaintiffs. In part this is true. Yet Sherman may have written these letters to Becker as the agent of the company, as Becker had invited him to do. There is proof Becker was not the com-

pany's agent at the time of the trial, but no proof he was not such agent at the date of said letters. Sherman, however, denied that he wrote these letters. Certain witnesses for defendant gave it as their opinion that they were in his handwriting, which also was a question for the jury. Defendant produced three witnesses on the subject of handwriting; one of whom, the special agent of the insurance company above referred to, testified he had a slight acquaintance with Sherman's signature. Another, a banker, had seen Sherman write on a single occasion, and the third, a justice of the peace from another county, was entirely unacquainted with Sherman's handwriting. Each testified to some experience in examining and comparing handwriting. They examined certain genuine signatures of Mr. and Mrs. Sherman in evidence and gave it as their opinion that the endorsement of the name of Sherman on the back of the check of the insurance company for $2,000 and the same name signed to the receipt for $2,000 were each the genuine signature of Sherman, and gave like testimony that the name of Mary A. Sherman on the back of the $2,000 check payable to her and on the face of the receipt for $2,000 were each her genuine signature. It is urged that this testimony required the jury to find these were the genuine signatures of these parties, and that their apparent conclusion to the contrary ought to be reversed. It is undoubtedly true that there is a great similarity between these signatures and those admitted to be genuine, and there is much force in the argument. Yet these were questions for the jury. The Shermans knew whether these were their signatures, and they persisted in testifying that they were not. Defendant's witnesses on that subject did not know, but only gave opinions, and they might be deceived by clever imitations. One other person knows whether these signatures are genuine, and that is Becker. The letters addressed to him, if genuine, show he was then in Illinois. Defendant was able to get these letters from him, which shows it was in touch with him. There is no proof by defendant concerning his subsequent place of liv-

ing. Defendant only proved that Becker was not in its employ at the time of the trial. No reason is shown why defendant did not produce and examine Becker as to the genuineness of these signatures, as well as upon the question of what occurred at the home of Sherman on October 14, 1901. The failure to produce material testimony apparently in the power of the party, or to show inability to produce it, is liable to create a presumption or inference in the minds of the jury that the proof is not offered because it would be unfavorable to it. Rector v. Rector, 3 Gilm. 105, 119; Mantonya v. Reilly, 184 Ill. 183; 1 Greenleaf on Evidence, Sec. 37; and W. & A. R. R. Co. v. Morrison, 40 L. R. A. 84.

It seems apparent that Becker went to the home of the Shermans prepared to pay them in full if necessary, and also prepared to commit some fraud upon them if he found he could. He had been furnished by defendant with its two checks for $2,000 each, with directions to deliver them to the two payees, and get their signatures to the two receipts. This was a simple duty, easy to perform. He took these papers to the bank cashier, and on the strength of a mere sight of them and without leaving any security or even check with the bank, obtained from it two drafts for $1,000 each and $1,859 in cash, being $4,000 more, less the $141 due as premium on the Earl Sherman policy. Even if it could be said Becker needed money enough to cash one of the $2,000 checks in order to get out of it the amount of that unpaid premium, that furnished no reason for taking along two drafts for $1,000 each. The natural conclusion is that he desired to be in a condition to shift the matter about in whatever form he found he could, and get the Shermans to take less than the whole amount at that time. If he found it was necessary to show them the cash, he could do that. If checks for half the amount would be accepted, then he was prepared for that. If he could not deceive them into accepting less than the whole amount, then he was prepared for that. If he succeeded in deceiving them into accepting a part only, then it was nec-

essary to the success of his scheme that he should either get their signatures on the back of the two checks for $2,000 each, without their seeing their face or knowing what they were endorsing, or else that he should afterwards forge their signatures on the back of said respective checks or procure that to be done. Unless we discard entirely, as false, the testimony of Sherman and his wife, we must believe either that they did not endorse these checks, or else that Becker so deceived them that he got their signatures without their knowing what they had done. In either case, defendant would be liable either for the forgery or the deception and fraud of its servant. The jury saw the demeanor of these witnesses, and saw them subjected to a very searching cross-examination. They believed that Sherman and his wife either did not endorse these checks at all, or that if these signatures were written by them, then they were procured by some trick which was a part of the fraud then practiced upon them. The trial judge approved that conclusion. The theory that plaintiffs knowingly loaned this money to Becker individually cannot prevail against their testimony. In the absence of the testimony of Becker we think the jury were warranted in concluding that the plaintiffs did not see or know of the existence of the two $2,000 checks on October 14, 1901, and that if the signatures on the backs thereof were their genuine signatures, then they were procured by some trick or device, and that the Shermans were that day deceived and defrauded by Becker.

Defendant contends that the documents we have called receipts were releases, and that if the signatures were genuine they bar relief at law, and can only be avoided in equity. Defendant did not raise this question by its pleading. Besides these instruments, if the signatures are genuine, are not release deeds, as set up in the plea on that subject, but are mere receipts for the payment of money. 24 Am. & Eng. Ency. of Law, 2nd ed., 283; Murphy v. Halleran, 50 Ill. App. 594; Redfield v. Holland P. I. Co., 56 N. Y. 354; Fire Insurance Ass'n v. Wickham, 141 U. S. 564; Crane v.

Alling, 15 N. J. Law 423; Baum v. Lynn, 72 Miss. 932; McCrea v. Purmort, 16 Wend. 460. Being mere receipts, they not only did not and could not establish the plea setting up a release deed, but also they were not conclusive, but could be contradicted and explained by parol proof in an action at law. Ludeke v. Sutherland, 87 Ill. 481; Primm v. Legg, 67 Ill. 500; Booth v. Hynes, 54 Ill. 363; Elder v. Hood, 38 Ill. 533.

We conclude the first and second instructions given at the request of plaintiffs are not fairly subject to the criticisms made upon them, and that the jury could in no way have been misled by any defect or omission in them, in view of the instructions given at defendant's request. The judgment is affirmed.

*Affirmed.*